**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **DEBRA O'DONNELL, Individually and** : <br> **as Administratrix of the Estate of JAMES** : <br> **PARSONS,** : <br> **c/o Gerhardstein & Branch Co. LPA** : <br> **441 Vine Street, Suite 3400** : <br> **Cincinnati, Ohio, 45202** : <br> : <br> **And** : <br> : <br> **SHERRY PARSONS** : <br> **c/o Gerhardstein & Branch Co. LPA** : <br> **441 Vine Street, Suite 3400** : <br> **Cincinnati, Ohio, 45202** : <br> : <br> : <br> **Plaintiff,** : <br> : <br> **v.** : <br> : <br> **G. MICHELE YEZZO** : <br> **614 Hillsdale Drive #244** : <br> **West Jefferson, Ohio 43162** : <br> *Individually* : <br> : <br> **and** : <br> : <br> **DANIEL CAPPY** : <br> **220 Woodedge Circle East** : <br> **Powell, Ohio 43065** : <br> *Individually* : <br> : <br> : <br> **and** : <br> : <br> **JOHN LENHART** : <br> **c/o Shelby County Sheriff Office** : <br> **555 Gearhart Road** : <br> **Sidney, Ohio 45365** : <br> *Individually* : <br> : <br> **and** : <br> : | **Case No.  3:17-cv-2657** <br><br> **Judge** <br><br> **Magistrate Judge** <br><br><br> <u>**COMPLAINT AND JURY DEMAND**</u> |

1

| | |
|---|---|
| **CHARLES MICHAEL WHITE,** | : |
| **1961 Townline 198 Road** | : |
| **Monroeville, Ohio 44847** | : |
| *in his individual and official capacity* | : |
| | : |
| **and** | : |
| | : |
| **CITY OF NORWALK** | : |
| **c/o Norwalk Law Department** | : |
| **38 Whittlesey Avenue** | : |
| **Norwalk, Ohio 44857** | : |
| | : |
|       **Defendants.** | |

## I.       Introduction

1.       James Parsons was imprisoned for 23 years for a crime he did not commit.  This

civil rights and wrongful death action challenges his illegal and wrongful prosecution and

imprisonment.  Mr. Parsons' wife Barbara was murdered on February 12, 1981.  An

investigation at the time of the murder, including a thorough review of available forensic

evidence, generated no indictments.  More than ten years later James Parsons was

indicted for and then convicted of the murder.  The key evidence was the alleged forensic

testing by Defendant Michele Yezzo, a scientific examiner employed by the Ohio Bureau

of Criminal Identification.  She used dubious techniques to link Mr. Parsons to a breaker

bar that was improperly identified as the alleged  murder weapon. At the time she

testified against Mr. Parsons she had recently been suspended from her position due to

erratic behavior and mental instability and in her file was a memo from her supervisor,

stating that "her findings and conclusions regarding evidence may be suspect. *She will

stretch the truth to satisfy a department*"  (emphasis added).  This dramatic exculpatory

evidence was withheld from counsel for Mr. Parsons and was not available at his trial to

challenge the credibility of Yezzo.  After the evidence was finally discovered in 2015,

Mr. Parsons was granted a new trial and released from prison based on the denial of access to this exculpatory information.  All charges were dismissed on April 21, 2016.  Mr. Parsons died on February 8, 2017 but this case is being pursued by his daughters through his estate.  State law claims are brought only against Defendants White and City of Norwalk.  Plaintiffs bring this action seeking fair compensation and to deter other law enforcement officers from withholding and failing to investigate exculpatory evidence and causing unjust convictions and wrongful incarcerations of innocent citizens.

## II.      Jurisdiction

2.      Jurisdiction over the federal civil rights claims is conferred on this Court under 28 U.S.C. § 1331 and § 1343(3) and (4).  Jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367(a).  Venue is proper in this division.

## III.      Parties

3.      Plaintiff Debra O'Donnell, Administratrix of the Estate of her father, James Parsons has at all times relevant to this action been a resident of the State of Ohio.  She brings the claims for loss of consortium and negligent infliction of emotional distress in her individual capacity as daughter to James Parsons but otherwise acts as the administrator of the estate of her father, James Parsons.

4.      Plaintiff Sherry Parsons has at all times relevant to this action been a resident of the State of Florida and brings the claims for loss of consortium and negligent infliction of emotional distress in her individual capacity as daughter to James Parsons.

5.      Defendant G. Michele Yezzo (hereafter Michele Yezzo) was at all times relevant to this Complaint a forensic scientist employed by the State of Ohio.  Defendant is a

3

"person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in her individual capacity.

6. Defendant Daniel Cappy was at all times relevant to this Complaint the Laboratory Director at the Ohio Attorney General's Bureau of Criminal Investigation employed by the State of Ohio. Defendant is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. He is sued in his individual capacity.

7. Defendant John Lenhart was at all times relevant to this Complaint the Superintendant at the Ohio Attorney General's Bureau of Criminal Investigation employed by the State of Ohio. Defendant is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. He is being sued in his individual capacity.

8. Defendant Michael White was at all times relevant to this Complaint a police officer employed by the Norwalk, Ohio Police Department. Defendant is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. He is sued in his individual and official capacity.

9. Defendant City of Norwalk, Ohio is a municipal corporation organized under the laws of the State of Ohio. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

### IV. Facts Relevant to Causes of Action

#### A. James Parsons is Falsely Convicted of the Murder of Barbara Parsons based on False Evidence

10. In 1981 James Parsons shared the family home at 109 Sycamore Drive, Norwalk, Ohio 44857, with his wife Barbara and their two daughters, Sherry and Debra.

4

11.     James and Barbara Parsons owned an auto repair and parts business in Norwalk, Ohio. James worked as the mechanic and Barbara was responsible for the bookkeeping.

12.     Barbara normally came to the shop late in the morning, long after her husband started work.

13.     On the morning of February 12, 1981, the girls and their father left the house separately, each before Barbara Parsons got out of bed.

14.     James Parsons, as was his normal routine stopped at Coffee Corner, a Norwalk restaurant and picked up breakfast for himself and his employee Dick Conrad.

15.     Mr. Parsons went directly to work after leaving Coffee Corner, and remained at work until he received a call from his friend Neil Burras who asked him out to lunch.

16.     Mr. Burras picked Mr. Parsons up for lunch at around noon. On his way out, Mr. Parsons mentioned to Mr. Conrad to remind Mrs. Parsons to place the supply order when she got into work that day.

17.     The two went to Berry's Diner for lunch. Mr. Burras brought Mr. Parsons back to work at approximately 1:15 p.m.

18.     Sherry got out of school at 2:30 p.m. and went to her parents' shop to talk to her mother. Mrs. Parsons was not at the shop so Sherry tried to call her. The line at the house rang busy.

19.     Sherry went home at approximately 3:45 p.m. She went upstairs looking for her mother, who she found dead in her bedroom.

20.     Mrs. Parsons had been beaten about the head and torso.

21.     Sherry ran across the street to a neighbor's house who contacted the police and Mrs. Parsons' sister.

5

22.     Mrs. Parsons' sister called Mr. Parsons, who was still at the shop. On hearing the news he was totally devastated and shocked.  Mr. Conrad immediately drove Mr. Parsons' home.

23.     When Mr. Parsons arrived at his house law enforcement officers on scene had to restrain him from entering.  He became overwrought, fainted and was taken to the hospital.

24.     Mr. Parsons was thoroughly examined at the hospital.  He had no scratches, injuries, or blood on his body.  The police met Mr. Parsons at the hospital. Although he had just been sedated and still coming to terms with his wife having been murdered that day, Mr. Parsons fully cooperated with the police examination, which included an interrogation by the Norwalk police.  Mr. Parsons acknowledged that he and Mrs. Parsons had been having marital difficulties.  He vehemently denied killing his wife. Norwalk police examined Mr. Parsons' body and clothes and found no signs of any involvement in Mrs. Parsons' murder. Mr. Parsons allowed the police to take the clothes he had been wearing that day from the hospital. He also signed a document granting the police permission to search his cars, home, and place of business.

25.     Norwalk Police determined through witness interviews of persons who had seen Mr. Parsons during the morning that Mr. Parsons truthfully accounted for his whereabouts away from the home during the time of the murder.

26.     During the course of the initial investigation in 1981 the police recovered two Craftsman breaker bars and investigated them as possible murder weapons.  One had recessed letters within a raised rectangular field on the handle and one had raised letters on the handle.  The Craftsman breaker bar with raised letters was recovered from  Neil

6

Burras. Both bars were forensically tested and no blood or other evidence was discovered on either of the bars to link them to Mrs. Parsons' murder.

27.     After a year-long investigation, which included surveillance of Mr. Parsons, no charges were filed against anyone for the murder of Barbara Parsons.

28.     More than a decade later Defendant Michael White, a Norwalk detective, reopened the case.

29.     Mr. White was a policymaker for the Norwalk Police Department and had the authority to reopen the Parsons' case. Mr. White had control over all aspects of the investigation.

30.     Mr. White looked back through the boxes of paper documents collected in the Parsons' investigation. Because he had a key, Mr. White was able to access the property room and physical evidence without supervision, and without signing in or out. Mr. White handled the evidence including the breaker bars, a sheet from Mrs. Parsons' bed, and the nightgown Mrs. Parsons was wearing when she was murdered. Mr. White altered the packaging in which the evidence was stored, and discarded evidence bags.

31.     Mr. White submitted the bed sheet and the Craftsman breaker bar with the recessed letters to the Cuyahoga County Coroner's Office, requesting that they examine the breaker bar and the sheet to determine if the breaker bar could be the source of any marks on the bed sheet. The Cuyahoga County Coroner's Office determined that at best they could not rule out that the breaker bar provided by Mr. White left the marks on the bedsheet, but they could not conclusively say that the breaker bar provided by Mr. White was the instrument that left the marks on the bedsheet.

7

32.     After submission to Cuyahoga County, Mr. White then submitted the bed sheet and the breaker bar with the recessed letters to Dr. Henry Lee of the Connecticut State Crime Lab. Dr. Lee was unable to conclusively tie the breaker bar to the bed sheet or to the murder.

33.     Not getting the answer he wanted from the numerous agencies which had examined the bedsheet, and breaker bar, which included the BCI, Cuyahoga County Coroner's Office, Connecticut State Crime Lab and FBI; Mr. White submitted evidence again to BCI - the bedsheet, nightgown and the recessed lettered breaker bar to Michele Yezzo, a scientist known by the BCI to "stretch the truth to satisfy a [law enforcement] department."

34.     Defendant White alleged that the breaker bar retrieved in 1981 from Mr. Parsons' friend Neil Burras, was the murder weapon.

35.     The breaker bar with the recessed letters submitted by Defendant White to Defendant Yezzo was not the breaker bar that had been recovered in 1981 from Mr. Parsons' friend Neil Burras.

36.     Ms. Yezzo claimed to conduct an analysis that included an overlay of the bedsheet on the breaker bar allowing her to temporarily visualize on the bedsheet two letters from the breaker bar. Although the word Craftsman was recessed on the breaker bar she tested, Ms. Yezzo alleged that she was able to see on the bedsheet a mirror image of the "N" and "S" of the word Craftsman from the breaker bar. She also alleged that she could visualize the unique end of the breaker bar on the fabric.  Ms. Yezzo failed to photograph all of her findings and did not reproduce her findings, leaving her as the sole source reporting that alleged scientific tests linked the bedsheet to the breaker bar.

37.     Ms. Yezzo's claimed analytical procedure was unreliable, not consistent with the standards of practice for chemical enhancement in 1993, and she knew her claimed results could not be verified.

38.     Ms. Yezzo was known for asking law enforcement "what they needed the evidence to say."

39.     Ms. Yezzo also had a reputation of giving law enforcement the answers they wanted if they "stroked her" ego.

40.     Ms. Yezzo knowingly prepared false forensic evidence that was used to establish probable cause for the arrest of James Parsons and later caused his conviction.

41.     Ms. Yezzo documented these falsely inculpatory findings in two reports and produced the falsified reports to the prosecutor, Russel Leffler, before trial for use by the prosecution.

42.     Defendant Yezzo purposely did not conduct her analysis of the evidence in such a way that all her findings could be verified – through another witness or photography – in order to produce the evidentiary report that Defendant White needed to establish probable cause.

43.     Defendant White knew that the breaker bar Defendant Yezzo tested was not the one retrieved from Mr. Parsons' friend Neil Burras.

44.     Defendant White knew that Defendant Yezzo prepared false forensic expert opinions linking the breaker bar she tested to the Parsons murder.

45.     Defendants White and Yezzo knew that in 1981 there was no probable cause to arrest James Parsons and the only new evidence that provided probable cause to arrest James Parsons in 1993 was the falsified forensic evidence, falsified findings incorporated

into two reports, and testimony of Michele Yezzo tying the breaker bar she tested to the Parsons murder.

46. Neither Defendant Yezzo nor Defendant White informed the prosecution that the breaker bar was not the one retrieved from Mr. Burras or that the testing results were falsified.

47. Primarily based upon her false testing results and testimony regarding the results of the examination of the breaker bar, bedsheet and nightgown Mr. Parsons was indicted for the murder of Barbara Parsons and he was convicted after trial in August, 1993.

48. During cross examination, Ms. Yezzo offered blood splatter opinions that were not in her written report. She was asked about why her written report did not include these opinions and responded that her "supervisor [Defendant Daniel Cappy] limited the scope of the reports that [she] was permitted to write [in reference] to this particular case."

49. In closing argument the prosecutor identified the testimony of Defendant Yezzo as critical to the State's case:

> I promised you that Barb Parsons would have the last word and she does. **Because without her blood, we don't pin him** [Mr. Parsons]. Her blood on that nightgown maintains the identifying marks of the eye from the head of the breaker bar. You remember what Michelle Yezzo said, it's not from the factory, it's a mark on this bar from using it, and it's there, it's an individualizing mark. She's a scientist." (Trial Tr. 1328-29 (emphasis added).)

50. At the conclusion of the trial, Mr. Parsons was convicted of murder and sentenced to a term of 15 years to life in prison.

51. James Parsons served 23 years in prison before his release.

10

**B. Yezzo Acted Consistent with her History of Falsifying and Producing Unreliable Evidence**

52.     During post-conviction proceedings the State stipulated that the personnel file of G. Michele Yezzo was not turned over to the defense prior to trial.

53.     That file contained crucial exculpatory evidence.

54.     Ms. Yezzo's file contained evidence that she had a history of stretching the truth to satisfy law enforcement and a history of mental illness that caused her findings to be unreliable.

55.     It was known in the laboratory that Ms. Yezzo was able to keep her position because police and prosecutors said good things about her. She even went as far as to ask law enforcement "what do you need the evidence to say?" Her employee file contained numerous letters from law enforcement that went beyond thank yous and compliments; the letters called her testimony for the prosecution a "collaborative venture" and referred to her as part of the law enforcement team.

56.     Less than two months before she testified at trial her supervisor Defendant Cappy documented that Ms. Yezzo reported to him that "her opinions are always wrong" and "she doesn't know what she is doing and is no longer capable of performing her duties". Mr. Cappy also reported that she will express a strong opinion about a procedure only to withdraw the opinion sometime later.

57.     Defendants Cappy and Lenhart knew that Defendant Yezzo was no longer confident in her abilities to perform her job and knew that she changed her opinions frequently due to her uncertainty in her testing results.

58.     Defendants Cappy and Lenhart permitted Defendant Yezzo to produce forensic opinions in various cases that were false and that were not consistent with professional standards.

59.     Defendants Cappy and Lenhart also knew that Defendant Yezzo had performed testing in the Parsons' case that was false, unverifiable, untestable, and inconsistent with standards of practice.

60.     Defendants Cappy and Lenhart knew how important scientific evidentiary results coming from the BCI laboratory were to establishing probable cause and securing convictions. Defendants Cappy and Lenhart permitted Defendant Yezzo to continue producing evidentiary reports without adequate supervision or verifying whether her results were true even when they knew she was producing false and unreliable scientific opinions. As a result of Defendant Lenhart's and Cappy's failure to supervise Defendant Yezzo, she was able to continue falsifying evidence which led to James Parsons' wrongful incarceration based on her falsified forensic evidence in his case.

61.     As detailed in the judgment entry releasing Mr. Parsons from custody and granting him a new trial entered by Judge Thomas Pokorny, *State of Ohio vs. James O. Parsons*, C.P. Huron County, Case No. CR 9300098 (Ohio Apr. 21, 2016),

> The Yezzo personnel file reveals that while at work in the B.C.I. Lab she experienced great difficulty in her relationships with others. Incidents involving her threats to kill others and herself; engaging in assaultive behavior toward co-workers, and contemptuous behavior toward her superiors are documented within the file. Her actions were viewed as having a detrimental effect on the department. The Assistant Superintendent of B.C.I. found in 1989 that Ms. Yezzo's problems at work were affecting her overall performance and that *"her findings and conclusions regarding evidence may be suspect. She will stretch the truth to satisfy a department."* The consensus of her supervisors from her evaluations and incident reports is that she suffered from mental

imbalance. In June of 1993 several months before testifying in the Parsons trial she was *put* on administrative leave. (emphasis added)

62.     Judge Pokorny found that the "suppression of this evidence deprived Mr. Parsons of his right to due process, specifically his right to confront his accusers at trial through a meaningful cross-examination of Ms. Yezzo….The court does now find that verdict in Mr. Parsons' trial is unworthy of confidence."

63.      Judge Pokorny also concluded that:

> The Court first finds by clear and convincing evidence that Ms. Yezzo's testimony was important and significant in establishing the tool as the murder weapon and ultimately securing a conviction for the State…Yezzo's testimony has now come under criticism because of the suggestiveness of her use of the phrase "consistent with,' in her analysis of the blood patterns, as well as her failure to preserve some of the chemical enhancement evidence with photographs. She was further criticized concerning her opinions about the feasibility of recessed letters on the tool leaving a blood pattern on the sheets and gown. But what has weighed most heavily on the Court's mind is the testimony from Ms. Yezzo's superior that the integrity of her analysis and conclusions may be suspect as she "will stretch the truth to satisfy a department". This opinion together with the other evidence of her troubled behavior in the workplace casts grave doubts about her credibility. Unquestionably this evidence could have been very useful to the defense in its cross-examination of Ms. Yezzo.

64.     Judge Pokorny vacated the conviction as a result of the failure to disclose this important exculpatory evidence regarding Michelle Yezzo.

### C. White, Yezzo , Cappy and Lenhart Concealed Exculpatory Evidence From Parsons' Counsel

65.     Defendant Lenhart had a policy of hiding exculpatory material evidence in limited access personnel files.

66.     Defendants Yezzo, Cappy and Lenhart knew of Ms. Yezzo's limited access personnel file, which included the material exculpatory evidence of Ms. Yezzo's history of stretching the truth and mental health instability.

67.     Defendants Yezzo, Cappy and Lenhart had a duty to inform the prosecution of the material exculpatory evidence so that it could be produced to Mr. Parsons' counsel. Defendants Yezzo, Cappy and Lenhart failed to disclose the material exculpatory evidence.

68.     The exculpatory value of the evidence in Ms. Yezzo's personnel file was apparent. Defendants Yezzo, Cappy, and Lenhart failed to disclose this exculpatory evidence to the prosecutor and to Parsons' defense attorney.

69.     Defendants White, Yezzo, Cappy, and Lenhart knew how material Ms. Yezzo's evidentiary testimony was in getting the grand jury to issue an indictment.

70.     Defendants Cappy, Yezzo and Lenhart knew that Defendant Yezzo was stretching the truth to satisfy law enforcement. Defendants Cappy, Yezzo and Lenhart knew how important the scientific evidentiary results coming from BCI laboratory were to establishing probable cause and securing convictions. Defendants Cappy and Lenhart permitted Defendant Yezzo to continue producing evidentiary reports without adequate supervision and without verifying whether her results were true.

71.     It was foreseeable that by continuing to inadequately supervise Defendant Yezzo false evidence would be introduced in criminal cases through Defendant Yezzo.

72.     By failing to adequately supervise Defendant Yezzo with respect to her scientific testing and opinions, Defendants Cappy and Lenhart acted with deliberate indifference to the rights of criminal suspects involved in cases where BCI did forensic testing.

14

73.     As a result of their failure to adequately supervise Defendant Yezzo, she was able to continue falsifying evidence which led to James Parsons' wrongful incarceration based on falsified forensic evidence.

74.     The evidence concerning Defendant Yezzo's personnel history and concerning her unreliable forensic testing was clearly exculpatory and the exculpatory nature of that evidence was apparent to Defendants White, Yezzo, Cappy and Lenhart.

75.     At all times relevant to this action Defendants White, Yezzo, Cappy and Lenhart acted negligently, recklessly, intentionally, knowingly, and with deliberate indifference to the rights of criminal suspects including James Parsons.

### D. City of Norwalk Policies Were Moving Force Behind Failure to Disclose Apparently Exculpatory Evidence

76.     Defendant White served as the final policymaker for the City of Norwalk with respect to the determination of what information from the police investigation would be disclosed to Prosecutor Leffler in the Parsons' case.  Defendant White's decisions on what to disclose to and what to suppress from the prosecution to be produced to Mr. Parsons' counsel was final, unreviewed and unreviewable.

77.     Defendant City of Norwalk failed to train and supervise Defendant White and the other detectives regarding their duty to investigate and disclose apparent exculpatory evidence to the Prosecutor's Office.

78.     Defendant White and Defendant City of Norwalk violated Mr. Parsons' due process rights when White failed to disclose apparently exculpatory evidence to the Prosecutor's Office in the Parson's case.

79.     The violation of the rights of criminal defendants including Mr. Parsons was foreseeable by Defendant City of Norwalk based on its failure to train and supervise

15

investigators including Detective White in their duty to investigate and disclose apparent exculpatory evidence to the prosecutor in the case.

### E. Injuries to Mr. Parsons

80.     James Parsons lost everything when his freedom was taken away.  The life he had built was destroyed when he was wrongfully prosecuted and convicted for Barbara Parsons' murder.

81.     The stress from what Mr. Parsons' knew to be a malicious prosecution based on falsified evidence began to manifest itself physically almost immediately. Mr. Parsons' high blood pressure and chronic heart problems were significantly exacerbated during the grand jury proceedings, trial and incarceration.

82.     The car repair business he had established and built – a business he truly loved and was good at - was completely destroyed.

83.     James Parsons lived in prison for 23 years and feared for his safety and health on a daily basis.

84.     Mr. Parsons suffered decades of stress, anxiety, and depression as a result of his wrongful prosecution and imprisonment. In 1993, he wrote from prison that his nerves were "very delicate" and he wished he was home.

85.     In 1999, he wrote to his daughter Sherry, telling her that she was the only thing that "keeps [him] alive" and "I don't have anything to live for my life is over." In his letter, he wrote to her of the emotional and physical trauma he experienced as a result of his fear that he would never obtain his freedom and find justice. He told her that when he found out an attorney would not be able to help him that he "was so sick… I had to lay

16

down. I guess I was in shock. I thought I was going to have to go to the infirmary my heart started pounding so fast. I haven't been right since."

86. His medical records repeatedly noted that he was anxious. Others included statements made by Parsons, including ones in 2015 that "I'll just die" and "I am ready to die."

87. Records from Wexner Medical Center indicated that on December 25, 2015 he was experiencing depression and suicidal ideation.

88. James Parsons also experienced chronic heart problems, exacerbated by decades of stress and depression brought on by his wrongful prosecution and incarceration. This included coronary artery disease, congestive heart failure, chronic atrial fibrillation, and an enlarged heart.

89. In the years before his death, James Parsons also suffered from vascular dementia, the risk factors of which include a history of heart attacks and atrial fibrillation.

90. Mr. Parsons' stress and anxiety from the wrongful prosecution and incarceration were so severe that he had to be placed on an antipsychotic drug Haloperidol and an anxiety medication Lorazepam.

91. Stress associated with Mr. Parsons' incarceration exacerbated his hypertensive cardiovascular disease and other diseases resulting in his death.

92. James Parsons suffered physical pain and suffering, severe emotional distress, terror, loss of freedom, embarrassment, humiliation, loss of consortium, and loss of nearly every right enjoyed by free citizens.

17

93.	James Parsons lost his ability to spend time with his loved ones.  His grandchildren grew up and he had no contact with them.  His entire life for over two decades was defined by an act that he did not commit.

### V. First Cause of Action: 42 U.S.C. § 1983
### Withholding Apparent Exculpatory Evidence and Falsifying Evidence
### And Failing to Investigate Exculpatory Evidence

94.	Defendants, acting under color of state law, deprived James Parsons of his clearly established right to due process of law and a fair trial secured by the Fourteenth Amendment to the United States Constitution, of which any reasonable person would have known.  These rights include the right to be free from the need to defend against false evidence and the right to have apparent exculpatory evidence disclosed in a timely manner. Defendants' actions, including but not limited to the submission of the wrong breaker bar for testing, falsification of the scientific test results, and the failure to disclose to the prosecutor apparent exculpatory evidence of Defendant Yezzo's personnel and scientific performance problems all caused James Parsons to be wrongfully convicted and sentenced to 15 years to life in prison and caused him to suffer from exacerbated heart and related health problems which led to his death.

95.	Defendant City of Norwalk is also liable for violating Parsons' due process rights. Defendant White was the lead City of Norwalk detective on Barbara Parsons' murder investigation. As such, his decisions about what information to turn over to Prosecutor Leffler were final, unreviewed, and unreviewable.  He acted as final policymaker for Defendants City of Norwalk regarding what evidence about the police investigation of the crime to disclose to the prosecutor, Russell Leffler including evidence of Defendant Yezzo's false test results, evidence that the breaker bar she tested was not the one

18

retrieved from Mr. Parson's friend, and evidence of Defendant Yezzo's personnel problems and practice of providing false scientific testimony. His decisions about what to disclose to Prosecutor Leffler constitutes City policy.

96. Defendant City of Norwalk failed to adequately supervise and train its' investigators including White regarding disclosure of exculpatory evidence to prosecutors and regarding the duty to investigate apparent exculpatory as well as inculpatory evidence. This failure to supervise and train amounts to a policy of turning a blind eye to potentially exculpatory evidence and demonstrates deliberate indifference to the rights of criminal suspects as it was highly likely to result in the wrongful conviction of innocent suspects such as James Parsons.

97. Defendant City of Norwalk's failure to adequately supervise and train its investigators in the disclosure of apparent exculpatory evidence to prosecutors was the moving force behind James Parsons' injures and the result of deliberate indifference to the rights of criminal suspects such as James Parsons.

## VI. Second Cause of Action: Malicious Prosecution –42 U.S.C. § 1983 Malicious Prosecution

98. Defendants Yezzo, Cappy, Lenhart and White caused James Parsons to be arrested without probable cause, convicted and imprisoned based on falsified forensic evidence, unreliable scientific testing, and testimony that was not subject to fair cross examination.

99. Defendants Cappy and Lenhart knew that Defendant Yezzo was stretching the truth to satisfy law enforcement. As a result of Defendant Cappy and Lenhart's failure to adequately supervise Defendant Yezzo, she was able to continue falsifying evidence

which led to James Parsons' wrongful incarceration based on a malicious prosecution sustained by falsified forensic evidence.

100.    The criminal conviction was ultimately reversed and charges dismissed but not until Mr. Parsons had endured 23 years in prison.

101.    But for Defendant Yezzo's fabricated evidence, probable cause to arrest Mr. Parsons could not have been established.

## VII. Third Cause of Action: Intentional Infliction of Emotional Distress

102.    Defendant White intentionally conducted an investigation that included fabricated evidence and deliberately ignored and failed to produce and/or pursue evidence that exculpated Mr. Parsons, and his deliberate concealment of that same evidence from the prosecutor and Mr. Parsons' defense, and his arrest of Mr. Parsons without probable cause, is outrageous conduct that flouts law enforcement's duty to act in the interest of justice.

103.    Defendant White knew or should have known that his outrageous conduct would result in serious emotional distress for Parsons, which in fact was the result as Parsons was wrongfully convicted of murder and sentenced to 15 – years to life, serving 23 years in prison.

104.    The emotional distress suffered by Parsons was severe and debilitating as he perceived the state ruthlessly attempting to separate him from the only family he had left and confine him for a crime he did not commit.

## VIII. Fourth Cause of Action: Wrongful Death

105.    Plaintiff, Debra O'Donnell, brings this claim of wrongful death against Defendant White, as the Administratrix of the Estate, and daughter and next of kin of James Parsons.

20

106. The stress, anxiety, and emotional distress caused by the wrongful conviction and extended wrongful incarceration exacerbated his heart disease which caused his death.

107. Mr. Parsons' death was the foreseeable and natural consequence of the actions of Defendant White described in this complaint.

108. Plaintiff and Mr. Parsons' next of kin have suffered the following damages as a result of Defendants' malicious and wrongful conduct as described above: loss of services, loss of society, including loss of companionship, consortium, care, assistance, attention, advise, mental anguish, pecuniary losses, loss of prospective inheritance, and funeral and burial expenses.

### IX. Fifth Cause of Action: Loss of Consortium

109. Plaintiffs Debra O'Donnell and Sherry Parsons were the natural children of the deceased, James Parsons.

110. As a direct and proximate result of the actions and/or inactions of Defendants White and City of Norwalk as detailed in this complaint, individually and/or collectively, Plaintiffs have been and are permanently deprived of companionship, love, and affection of their father, James Parsons.

111. That as a further direct and proximate cause of Defendants White and City of Norwalk's actions, inactions, violations, and breaches of duty, individually and/or collectively, Plaintiffs have suffered damages, including but not limited to the loss of services, society, inheritance, companionship, comfort, love, and solace of their father, James Parsons.

### X. Sixth Cause of Action: Negligent Infliction of Emotional Distress

112. Defendant White owed a duty of care to Debra O'Donnell and Sherry Parsons.

21

113.    It was reasonable and foreseeable that Plaintiffs would suffer severe emotional injuries from witnessing their father, James Parsons' prosecution based on evidence Defendant White knew to be false.

114.    It was reasonable and foreseeable that Plaintiffs would suffer severe emotional injuries from witnessing their father, James Parsons' mental and physical decompensation as a result of his wrongful incarceration due to the negligent actions of Defendant White.

115.    Plaintiffs witnessed the trial and presentation of the falsified evidence against their father including false evidence provided by Defendant White such as claiming that the bar with recessed letters was the bar recovered from Mr. Burras when it was not.

116.    Plaintiffs witnessed the jury return a verdict convicting their father of murdering their mother based upon falsified evidence that Defendant White hid from the prosecution including evidence that would have undermined the testimony of Defendant Yezzo that was not shared with the prosecutor.

117.    Defendant White's actions breached a duty of care to Debra O'Donnell and Sherry Parsons and exacerbated the medical conditions that led to the death of James Parsons.

118.     Defendant White negligently inflicted emotional distress on Debra O'Donnell and Sherry Parsons.

119.    Defendant White acted recklessly.

120.    As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs Debra O'Donnell and Sherry Parsons have suffered and continue to suffer severe and debilitating emotional distress.

22

## IX. JURY DEMAND

121.    Plaintiffs request a jury trial on all claims triable to a jury.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court award:

A.    Compensatory damages in an amount to be shown at trial;

B.    Punitive damages against Defendants Yezzo, Cappy, Lenhart and White in an amount to be shown at trial (no punitive damages are sought against the City of Norwalk);

C.    Costs incurred in this action and reasonable attorney fees under 42 U.S.C. §1988;

D.    Prejudgment interest; and

E.    Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

| | |
|---|---|
| s/ Alphonse A. Gerhardstein<br>Alphonse A. Gerhardstein (0032053)<br>Trial Attorney for Plaintiff<br>Jennifer L. Branch (0038893)<br>Janaya Trotter Bratton (0084123)<br>Gerhardstein & Branch, Co LPA<br>441 Vine Street, Suite 3400<br>Cincinnati, Ohio 45202<br>(513) 621-9100<br>Fax (513) 345-5543<br>agerhardstein@gbfirm.com<br>jbranch@gbfirm.com<br>jtbratton@gbfirm.com<br>www.gbfirm.com | |

23