# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Debra O'Donnell, *et al.*,                                    Case No. 3:17CV2657

                Plaintiffs

        v.                                                    **ORDER**

G. Michelle Yezzo, *et al.*,

                Defendants

This is a civil rights case.

Plaintiff Debra O'Donnell brings representative due process claims, on behalf of her late father, James Parsons under 42 U.S.C. § 1983; she also brings related state law claims. O'Donnell's claims arise out of her father's conviction, which an Ohio state court vacated, for murdering his wife.

O'Donnell alleges that, during the murder case, defendants 1) failed to disclose exculpatory evidence and falsified forensic evidence; and 2) maliciously prosecuted her father. Defendants include the City of Norwalk, Ohio, plus four individual defendants: G. Michelle Yezzo, a forensic scientist at the Ohio Bureau of Criminal Investigation (BCI); Daniel Cappy, BCI Laboratory Director; John Lenhart, BCI Superintendent; (the State defendants) and Michael White, a Norwalk Police Detective (the City defendants).

Additionally, O'Donnell (who administers her father's estate) and her sister, Sherry Parsons, bring a personal negligent infliction of emotional distress claim against White and a personal loss of consortium claim against White and the City.

Now pending are the State defendants' motion to dismiss (Doc. 13) and the City defendants' motion for judgment on the pleadings (Doc. 20).

For the reasons that follow, I grant the State Defendants' motion, and I deny the City Defendants' motion in part and grant it in part.

## Background

James Parsons served twenty-three years in prison after a Huron County, Ohio jury convicted him of murdering his wife, plaintiffs' mother, Barbara Parsons. (Doc. 1 at 10, ¶¶ 50-51). On completing his sentence, he moved for post-conviction relief, and, on April 21, 2016, the trial court vacated his conviction and ordered a new trial. (*Id.* at 13, ¶ 64).

The events leading to the conviction began on On February 12, 1981, when plaintiff Sherry Parsons found her mother in her bedroom, beaten to death. (*Id.* at 5, ¶¶ 19-20). A police investigation revealed that a half-inch Craftsman breaker bar was the murder weapon. The Norwalk Police Department recovered two such breaker bars, but forensic testing linked neither breaker bar to the murder. (*Id.* at 6-7, ¶ 26). Despite a year-long investigation, the Department filed no charges. (*Id.* at 7, ¶ 27).

More than ten years later, defendant Detective White reopened the case. White handled the physical evidence from the investigation, including sheets from the bedroom, Mrs. Parsons's nightgown, and the two breaker bars. (*Id.* at ¶¶ 28, 30).

White submitted this evidence, choosing one of the two breaker bars, to four different forensic investigative agencies, including BCI. (*Id.* at 7-8, ¶¶ 31-33). The breaker bar White

submitted apparently was not the murder weapon, and plaintiffs allege White knew as much. (*Id.* at 8-9, ¶¶ 34-35, 43-44). The investigative agencies reached inconclusive results. (*Id.* at 7-8, ¶¶ 31-32).

White next resubmitted the evidence to BCI, thereby engaging Yezzo's services. Yezzo's findings connected the breaker bar to the imprints on the sheet. (*Id.* at 8, ¶ 33). She claimed that she observed on the sheet mirror images of the letters "N" and "S" from the breaker bar's handle and unique markings from the breaker bar's end. (*Id.* at ¶ 36). Yezzo testified about her findings at grand jury proceedings and the murder trial. (*Id.* at 9-10, ¶¶ 45, 48-49).

O'Donnell and Parsons allege that Yezzo's investigation was flawed. First, they allege that White knowingly turned over the wrong breaker bar for testing. (*Id.* at 9, ¶ 43). Second, they allege that Yezzo used unreliable testing methods skewed her results to please Detective White. Moreover, Yezzo's personnel file at BCI indicated that she was known to "stretch the truth to satisfy a department" and that she showed signs of mental instability. (*Id.* at 2, ¶ 1).

The prosecution did not turn over Yezzo's personnel file to the accused father's attorney before or during the murder trial. (*Id.* at 11, ¶ 52). On the father's post-trial motion to vacate his conviction, the state court judge found that "this evidence could have been very useful to the defense in its cross-examination of Ms. Yezzo."[1] Citing Yezzo's unreliability, the judge vacated the conviction. (*See* Attachment A).

**Standard of Review**

---

[1] I take judicial notice of the state court opinion on the motion for new trial and the Huron County Common Pleas Court docket in the father's case. *See Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1028-29 (N.D. Ohio) (Lioi, J.) ("Court rulings . . . are matters of public record, and matters of which a court may properly take judicial notice). This does not convert defendants' motions into motions for summary judgment. *Id.* The state court opinion is attached hereto as Attachment A, and the Huron County Common Pleas Court docket is attached hereto as Attachment B.

Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."

Both parties agree that the City Defendants' Rule 12(c) motion is premature, given that the pleadings are not closed because the remaining defendants have not filed an answer. *Horen v. Bd. of Educ. of Toledo Sch. Dist.*, 594 F. Supp. 2d 833, 840 (N.D. Ohio 2009) (Carr, J.). They also agree, as do I, that I can and should treat the 12(c) motion as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). (Doc. 20 at 3; Doc. 23 at 4); *see also Horen*, *supra*, 594 F. Supp. 2d at 840. Therefore, I apply the standard of review applicable to motions to dismiss under Fed. R. Civ. P. 12(b)(6) to both of the pending motions.

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* At this stage, I must "draw all reasonable inferences in favor of [plaintiffs]." *Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016).

## Discussion

### A. Constitutional Claims

O'Donnell claims that defendants violated her father's Fourteenth Amendment due process rights in two ways: 1) by withholding and failing to investigate exculpatory evidence and falsifying evidence (the *Brady* claims) and 2) by maliciously prosecuting the accused father's criminal case.

### 1. O'Donnell Has Standing in This Case

Article III, § 2 of the Constitution authorizes the federal courts to hear only "Cases" and "Controversies."

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, --- U.S. ---, ---, 136 S.Ct. 1540, 1547 (2016). The doctrine "seeks to ensure the plaintiff has a personal stake in the outcome of the controversy." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 490 (6th Cir. 2017). The "irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, *supra*, --- U.S. at ---, 136 S.Ct. at 1547 (internal citations and quotation marks omitted).

The parties dispute whether O'Donnell has standing to bring the § 1983 claims on behalf of her late father.[2]

Defendants argue that the § 1983 claims abated of her father. They further argue that O'Donnell must allege a physical injury for Decedent's claims to survive. O'Donnell, citing the Sixth Circuit's recent decision in *Crabbs v. Scott*, 880 F.3d 292 (2018) disputes that contention.

I agree with O'Donnell that the claims survived her father's death.

To determine whether § 1983 claims did so, I must "first look to federal law for an applicable rule of decision." *Crabbs*, *supra*, 880 F.3d at 294 (internal citation omitted). "If no suitable federal rule exists," I apply Ohio law "to the extent it is 'not inconsistent with the Constitution and the laws of the United States.'" *Id.* (quoting *Robertson v. Wegmann*, 436 U.S. 584, 588-95 (1978)).

---

[2] The State Defendants raise the standing issue in their motion (Doc. 13 at 7-12), and the City Defendants incorporate their argument into their motion by reference (Doc. 20 at 3, 10).

Federal law is silent regarding survival of § 1983 claims. *Id.* Therefore, Ohio's survivorship statute, O.R.C. § 2305.21, applies. Under that provision, "In addition to the causes of action which survive at common law, causes of action for . . . injuries to the person or property . . . also shall survive; and such actions may be brought notwithstanding the death of the person entitled or liable thereto."

The Sixth Circuit in *Crabbs* established that the § 1983 claims survived the father's death: "§ 1983 claims are best characterized as personal injury actions." 880 F.3d at 295. The court further held that the plaintiff need not allege a physical injury for the claim to survive. *Id.* at 296 (noting the Ohio Supreme Court has not required such a showing). In reaching its holding, the court in *Crabbs* encouraged a "straightforward and uniform characterization of § 1983 claims." *Id.* at 295. Indeed, the court explained, "all § 1983 claims must be characterized the same way." *Id.* at 294.

Therefore, under *Crabbs*, the father's § 1983 claims survived his death, and O'Donnell need not show a physical injury to maintain those claims as his representative.[3]

## 2. Yezzo Is Not Absolutely Immune from Suit for Her Non-Testimonial Acts

Yezzo argues that she enjoys absolutely immunity from O'Donnell's § 1983 claims.

"[I]n litigation brought under 42 U.S.C. § 1983, all witnesses – police officers as well as lay witnesses – are absolutely immune from civil liability based on their testimony in judicial proceedings." *Briscoe v. LaHue*, 460 U.S. 325, 328 (1983). But absolute immunity does not

---

[3] Defendants hint in their motions that O'Donnell has not properly asserted the *Brady* claim under § 1983. (*See* Doc. 13 at 13) ("Furthermore, the U.S. Supreme Court has stated that '*Brady* claims have ranked within the traditional core of habeas corpus and outside the province of § 1983.'") (internal citation omitted)). I decline to undertake an analysis of those claims' propriety under § 1983.

insulate all of the witness's actions. Accordingly, I must apply a "functional approach" to determine whether absolute immunity protects Yezzo. *See Rehberg v. Paulk*, 566 U.S. 356, 363 (2012) (internal quotations omitted). Using this approach, I examine "the nature of the function[s] performed" to "determin[e] whether [Yezzo's] actions … fit within a common-law tradition of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993).

Yezzo claims that she is absolutely immune from suit because "Plaintiff has used [her] grand jury testimony and trial testimony as a basis for a federal malicious prosecution action." (Doc. 13 at 20). O'Donnell concedes that absolute immunity shields Yezzo from liability based on her testimony. (Doc. 19 at 14). She argues, however, that Yezzo is not absolutely immune from suit based on plaintiffs' allegations that Yezzo falsified her findings and "produced the falsified reports to the prosecutor." (*Id.*).

I agree with O'Donnell.

Absolute immunity does not extend to a witness's "non-testimonial" acts. *See Spurlock v. Satterfield*, 167 F.3d 995, 1001-02 (6th Cir. 1999). Indeed, "absolute immunity does not relate backwards to protect a defendant for any activities he allegedly engaged in prior to taking the witness stand for his . . . testimony." *Id.* at 1001 (internal quotations and citation omitted). And "[t]he simple fact that acts may ultimately lead to witness testimony does not serve to cloak these actions with absolute testimonial immunity." *Id.*

The court in *Spurlock* held that the defendant enjoyed absolute immunity for testimony only, and not for bribing a witness and threatening him with prosecution. It did not matter, the court explained, that these non-testimonial acts ultimately led to the defendant's trial testimony. "What plaintiffs, in essence, allege here is the fabrication of probable cause, and . . ., the fabrication of probable cause cannot be later immunized by false testimony." *Id.* at 1004; *cf.*

*LeFever v. Ferguson*, 567 Fed. App'x 426, 431 (6th Cir.) (holding absolute immunity protected toxicologist because plaintiff's claim centered on toxicologist's findings about which he testified with certainty but reached no conclusive finding in his pre-trial report).

Absolute immunity clearly protects Yezzo from claims based on her testimony. *Spurlock*, *supra*, 167 F.3d at 1001. But O'Donnell also alleges that Yezzo "falsifi[ed] scientific test results" (Doc. 1 at 18, ¶ 94) and that, "[b]ut for Defendant Yezzo's fabricated evidence, probable cause to arrest Mr. Parsons could not have been established." (*Id.* at 20, ¶ 101). Yezzo's testimony does not provide her absolute immunity for these non-testimonial acts.

### 3.     The State Defendants Enjoy Qualified Immunity From the § 1983 Claims

The State Defendants assert the qualified immunity defense.

Qualified immunity protects public officials from suit against private citizens. *See Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). Once a defendant "raise[s] the qualified immunity defense, plaintiff bears the burden of showing that defendants are not entitled to qualified immunity." *Id.* (citing *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012)). "At the pleading stage, this burden is carried by alleging facts plausibly making out a claim that the defendant's conduct violated a constitutional right that was clearly established at the time." *Id.* (citing *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015)).[4] "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (internal quotations omitted)).

---

[4] Generally, this inquiry proceeds in two steps: 1) whether plaintiff showed that defendants' conduct violated a constitutional right" and 2) whether "the right was clearly established." *Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (internal quotations omitted)). The Supreme Court has held that, "[w]hile the sequence set forth [in *Saucier*] is often appropriate, it" is not "mandatory." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### a. Qualified Immunity: Yezzo

Defendants argue that Yezzo enjoys qualified immunity from O'Donnell's § 1983 claims. Moreover, defendants assert, the Complaint contains insufficient factual allegations "to prove [Yezzo] is not entitled to qualified immunity." (Doc. 13 at 22). Rather, they argue, the Complaint "includes conclusory allegations couched as facts" to rebut the qualified immunity defense. (*Id.*).

O'Donnell responds that "Defendants' argument . . . is actually an argument over whether plaintiffs allegations are pled in such a way that they are sufficient to state a claim." (Doc. 22 at 16). She goes on to argue that the Complaint pleads facts sufficient to overcome a motion to dismiss.

O'Donnell mischaracterizes defendants' argument. To overcome the qualified immunity defense, she bears the burden to "[p]lead *facts* that, viewed in the light most favorable to [her], make out a violation of a constitutional right [that is] clearly established in a particularized sense." *Johnson*, *supra*, 790 F.3d at 653 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In determining whether she met this burden, I disregard "legal conclusion[s] couched as . . . factual allegation[s]." *D'Ambrosio v. Marino*, 2013 WL 256312, *9 (N.D. Ohio) (Polster, J.).

I agree with defendants that O'Donnell has not met her burden to allege facts showing a constitutional violation.

The Complaint alleges that: Yezzo analyzed "an overlay of the bedsheet on the breaker bar" that, according to Yezzo, enabled her "to see on the bedsheet a mirror image of the 'N' and 'S' of the word Craftsman" and the breaker bar's unique end (Doc. 1 at 8, ¶ 36); Yezzo did not photograph her findings; Yezzo used unreliable procedures and "knew her claimed results could not be verified" (*id.*); and Yezzo had a reputation for delivering law enforcement's desired results. (*Id.* at 9, ¶¶ 38-39).

The allegations go on: "Yezzo knowingly prepared false forensic evidence." (*Id.*, ¶ 40). Critically, this allegation does not identify what evidence – that is which, if any, of Yezzo's findings – Yezzo falsified. *Contra Gregory v. City of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006) (denying summary judgment on qualified immunity issue on *Brady* fabrication claim where evidence indicated that forensic scientist withheld two hairs police recovered in its investigation when concluding in her report that five hairs so recovered linked plaintiff to the crime). Rather, plaintiffs' "assertion" that Yezzo knowingly prepared false evidence "is an example of a legal conclusion couched as a factual allegation," which I disregard. *See D'Ambrosio*, *supra*, 2013 WL 256312 at *9 (disregarding allegation that defendant "'concealed' exculpatory evidence" as "a legal conclusion couched as a factual allegation").

The Complaint contains no factual allegations identifying how Yezzo lied about the evidence. Indeed, none of the allegations state what she falsified in her report. That Yezzo used unreliable methods or failed to photograph her findings does not equate to fabrication. Nor does the allegation that Yezzo "documented [her] falsely inculpatory findings" (Doc. 1 at 9, ¶ 41) in her reports cure the Complaint's insufficiency. These allegations fail to set forth sufficient facts to overcome Yezzo's qualified immunity defense.

### b. Qualified Immunity: Cappy and Lenhart

Defendants argue that Cappy and Lenhart enjoy qualified immunity from the § 1983 claims. First, they argue that neither Cappy nor Lenhart, as Yezzo's supervisors, had *Brady* obligations in the accused father's case. Second, they argue that the failure-to-train-or-supervise claim against them fails because they did not actively participate in Yezzo's alleged misconduct. (Doc. 13 at 26).

In response, O'Donnell briefly argues that "*Brady* require[s] the disclosure of both impeachment and exculpatory evidence," and, accordingly Cappy and Lenhart are not immune. (Doc. 22 at 17 (citing *United States v. Bagley*, 473 U.S. 667, 677 (1985)). O'Donnell apparently purports to claim that Cappy's and Lenhart's failure to disclose Yezzo's personnel file amounted to a constitutional violation of the father's clearly established rights. (*See id.* at 16 (referring to the "exculpatory value" of Yezzo's personnel file "as material that cast doubt on her credibility and reliability, and which was withheld from the prosecution and defense by Defendants Cappy and Lenhart")). O'Donnell further argues that Cappy and Lenhart acted with deliberate indifference to her father's rights "in their training and supervision of Defendant Yezzo." (*Id.* at 18).

### i. Cappy and Lenhart Are Immune From O'Donnell's Claims That They Failed to Turn Over Yezzo's Personnel File

O'Donnell provides no support for the conclusory argument that Cappy and Lenhart, as Yezzo's supervisors, owed Decedent a *Brady* obligation to turn over Yezzo's personnel file. Rather, O'Donnell baldly asserts that Cappy and Lenhart violated Decedent's constitutional right to disclosure of impeachment evidence. (*See* Doc. 22 at 16-17).

Cappy and Lenhart argue that they owed Decedent no *Brady* obligation because they had no role on the prosecution team in his case. They further argue that Decedent's conviction cut off any obligation that they disclose information about Yezzo. (Doc. 13 at 26).

I find that O'Donnell has not articulated a clearly established right that Cappy and Lenhart violated.

O'Donnell bears the burden to show, "in light of the specific context of the case" that Cappy and Lenhart's failure to turn over Yezzo's personnel file violated a clearly established right. *Saucier*, *supra*, 533 U.S. at 201. She claims that Decedent had a clearly established right to

"the disclosure of both impeachment and exculpatory evidence." (Doc. 22 at 17 (citing *Bagley*, *supra*, 473 U.S. at 677)).

The court in *Bagley* held that *Brady* applies with equal force to exculpatory and impeachment evidence. 473 U.S. at 677. That case involved a criminal defendant's claim that the government should have introduced agreements between the government and its witnesses to disclose certain information for pay. *See id.* O'Donnell's complaint fails to explain how *Bagley* applies to this context – that is, upper-level BCI administration's failure to overturn an investigator's file as impeachment evidence. Rather, she generally submits that her father had a due process right to impeachment evidence. O'Donnell falls short of her burden to articulate a clearly established right in the context of this case. *See Roell v. Hamilton Cty.*, 870 F.3d 471, 483-84 (6th Cir.) (finding plaintiff failed to overcome qualified immunity defense by citing Sixth Circuit case involving different type of conduct than that alleged in her case).

### ii. Cappy and Lenhart Are Immune From O'Donnell's Claims That They Failed to Supervise Yezzo

O'Donnell also alleges that Cappy and Lenhart violated Decedent's *Brady* rights in their capacity as Yezzo's supervisors. Accordingly, she argues, Cappy and Lenhart are not immune from the *Brady* claim to the extent they failed to supervise Yezzo.[5]

"[S]upervisor liability under § 1983 is appropriate when 'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it,' or 'at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct.'" *Leary v. Daeschneri*, 349 F.3d 888, 903 (6th Cir. 2003) (quoting *Bellamy v. Bradly*, 729 F.2d

---

[5] The parties' briefs contemplate both a failure-to-train and a failure-to-supervise claim against Cappy and Lenhart. The complaint's allegations, however, relate only to their alleged failure to supervise Yezzo. I therefore do not address whether Cappy and Lenhart adequately trained Yezzo.

416, 421 (6th Cir. 1984)). Moreover, "simple awareness of employees' misconduct does not lead to supervisor liability." *Id.* Accordingly, there is no respondeat superior liability in § 1983 cases. *Id.* (citing *Taylor v. Michigan Dep't of Corrs.*, 69 F.3d 76, 81 (6th Cir. 1995)).

Defendants argue that O'Donnell cannot show that Cappy and Lenhart "directly participated in, or assisted" Yezzo in preparing her results for Decedent's case. (Doc. 13 at 26). O'Donnell counters that Cappy and Lenhart's knowledge of Yezzo's performance deficiencies and instability equates to deliberate indifference. (Doc. 22 at 18).

O'Donnell proceeds under the incorrect standard. The "deliberate indifference" standard applies in suits against government employees in their official capacities. *See Essex v. Cty. of Livingston*, 518 Fed. App'x 351, 356-567 (6th Cir. 2013) ("Whereas the County's liability may be premised on its policymaker's deliberate indifference, the individual defendant may be liable only upon a showing of personal involvement." (quoting *Harvey v. Campbell Cty.*, 453 Fed. App'x 557, 563 (6th Cir. 2011) (internal quotations omitted)). O'Donnell must "point to some actual conduct by [Cappy and Lenhart] that directly contributed to [Decedent's] injury." *Id.* at 357.

As defendants point out, O'Donnell does not allege that Cappy and Lenhart encouraged Yezzo or otherwise directed her to fabricate evidence in Decedent's case. At most, she alleges awareness: that Cappy and Lenhart knew Yezzo previously used unreliable methods and that she expressed uncertainty about her competence. Accordingly, O'Donnell falls short of her burden.

In light of these findings, Cappy and Lenhart are immune from the § 1983 claims.

### 4. Merits Issues

#### a. O'Donnell Has Stated a *Brady* Claim Against the City

O'Donnell claims that the City violated her father's constitutional rights to exculpatory and impeachment evidence.[6]

Claims against municipalities may proceed in limited circumstances. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (holding that, while municipalities may be subject to § 1983 liability, a *respondeat superior* theory of liability is insufficient in such cases). "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury that the government entity is responsible under § 1983." *Id.* at 691.

Here, O'Donnell proceeds under two alternative theories of liability against the City. First, she argues that White acted as the City's final policymaker with respect to the murder investigation leading to the father's conviction. (Doc. 1 at 18-19, ¶ 95). Second, she claims that the City neglected to "adequately supervise and train its' [*sic*] investigators including White regarding" their evidentiary duties. (*Id.* at 19, ¶ 96).

"[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Such liability "attaches only where the decisionmaker possesses the final authority to establish municipal policy with respect to the action ordered." *Id.* at 481. "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.3d 649, 655 (6th Cir. 1993) (citing *City of St. Louis v. Praprotnik*, 485 U.S.112, 127(1988)).

---

[6] O'Donnell raises *Brady* claims against the State Defendants, but I decline to assess the merits of those claims in light of findings that they are immune from those claims.

"[W]hether an official had final policymaking authority is a question of state law." *Pembaur*, *supra*, 475 U.S. at 481. "This includes 'state and local positive law,' such as statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Feliciano*, *supra*, 988 F.3d at 655 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

The City argues that White, as a "subordinate police officer[]," is not a final policymaker. (Doc. 20 at 8). In support, the City notes that the Director of Public Safety leads the City police department, which, in turn, employs a police chief. The police chief has authority to discipline subordinate officers, such as White. (*Id.* (citing Ohio Rev. Code §§ 737.05, 737.12)). O'Donnell responds that White "was the final policymaker for [the Parsons] investigation." (Doc. 26 at 8 (citing Doc. 1 at ¶ 76)).

I agree with O'Donnell that White acted as a final policymaker in the investigation.

The Sixth Circuit has held that a police officer/investigator may be a final policymaker respecting an investigation if the officer exercises final, unreviewable authority over the investigation. *See Monistere v. City of Memphis*, 115 Fed. App'x 845, 853 (6th Cir. 2004). In *Monistere*, the investigator received no direction from superiors respecting the investigation, and the department head, *per* department practice, gave the investigator "unfettered discretion." *Id.* at 852. Accordingly, the court held, the investigator "did not merely exercise discretion but rather acted as a final policymaker within the context of this case." *Id.*; *see also Rush v. City of Mansfield*, 771 F. Supp. 2d 827, 864-65 (N.D. Ohio 2011) (holding detective was final policymaker respecting investigation when unwritten department policy provided him "unconstrained discretion" to determine contents of briefing provided to tactical team and no policy otherwise governed such briefing); *Cline v. City of Mansfield*, 745 F. Supp. 2d 773, 815-

16, 843 (N.D. Ohio 2010) (O'Malley, J.) (finding agent who executed warrant, but not police chief, was final policymaker for purposes of warrant's execution where police chief was not present when warrant was executed but agent had "final and unreviewable" discretion regarding warrant's execution) (internal citations and quotations omitted).

Here, O'Donnell alleges that White "had the authority to reopen the Parsons' [*sic*] case . . . [and] had control over all aspects of the investigation." (Doc. 1 at 7, ¶ 29). That control, according to the Complaint, was "final, unreviewed, and unreviewable." (*Id.* at 15, ¶ 76).

Because the O'Donnell has plead facts to demonstrate White acted as a final policymaker respecting the investigation, I deny the City Defendants' motion as to the *Brady* claims.[7]

### b.    O'Donnell Has Not Stated a Claim for Malicious Prosecution

O'Donnell alleges that White and the State Defendants maliciously prosecuted Decedent's murder case.[8]

To make out a claim for malicious prosecution, O'Donnell must show:

> (1) That a criminal prosecution was initiated against [Decedent] and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the [Decedent] suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the [Decedent's] favor.

*Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir.2017) (internal quotations and citations omitted).

Defendants argue that the accused father's criminal proceedings did not conclude in his favor. (Doc. 13 at 16; Doc. 20 at 10-11). It is not enough, they claim, that the state court vacated the conviction and ordered a new trial. (Doc. 13 at 16-17; Doc. 20 at 10-11) (citing Attachment B

---

[7] In light of my finding that White acted as a final policymaker, I decline to reach the failure-to-train argument.

[8] White incorporates the State Defendants' arguments against malicious prosecution in his brief by reference. (*See* Doc. 20 at 10-11). I therefore refer to both defendants' briefs in this section.

to this order)). O'Donnell responds that "because there is no guilty verdict and charges have been dropped, the criminal proceeding has resolved in Mr. Parsons's favor." (Doc. 22 at 13).

Although the Sixth Circuit has not articulated a clear rule to apply in this circumstance, I agree with defendants.

None of the Sixth Circuit cases the parties cite directly support their respective positions.

In *Mills v. Barnard*, *supra*, which O'Donnell cites, the plaintiff appealed a trial court's decision to deny him post-conviction review of all but one of the charges against him. The appellate court subsequently "overturned all of [his] convictions." 869 F.3d at 478. Here, however, at the time of his death, the accused father remained in judicial limbo. Though the trial court vacated his conviction and ordered a new trial, no subsequent proceedings occurred. Accordingly, at the time of his death, Decedent's criminal case remained unresolved.

On the other hand, *Nouri v. County of Oakland*, 615 Fed. App'x 291 (6th Cir. 2015), which defendants cite, contains additional facts not present here. In that case, the court concluded that criminal charges had not been resolved in the plaintiff's favor where the court reversed his conviction and ordered a new trial. The plaintiff in *Nouri* signed a plea deal, which resulted in the dismissed conviction. "[C]ourts do not consider that sort of compromise to be sufficiently favorable to the criminal defendant to support a malicious prosecution claim." *Id.* at 300 (internal citations omitted). No such plea deal exists here.

Finding no Sixth Circuit case law that gives clear guidance on this set of facts, I look to other circuits' precedent. First, Second, and Seventh Circuit opinions are instructive.

According to the Second Circuit, "Proceedings are terminated in favor of the accused only when their final disposition is such as to indicate the accused is not guilty." *DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996) (internal quotations and citations omitted).

Therefore, a plaintiff could not show a favorable resolution where a court reversed his conviction and ordered a new trial. *Id.*; *see also Bristol v. Nassau Cty.*, 685 Fed. App'x 26, 29 (2d Cir. 2017) (finding no favorable termination despite a new trial order where plaintiff awaited trial on his pending indictment).

The First Circuit likewise has held that a plaintiff's "section 1983 claims did not accrue [for statute of limitations purposes] until their respective criminal prosecutions ended in acquittals." *Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 4 (1st Cir. 1995).

The Seventh Circuit indicates that a plaintiff may be able to show favorable resolution without an acquittal. *See Julian v. Hanna*, 732 F.3d 842, 845 (7th Cir. 2013). The court in *Julian* explained that a criminal case ends in the plaintiff's favor in one of two circumstances: 1) where "the retrial was held, and ended favorably to him, or" 2) "the charges against him were dropped without a retrial." *Id.*

Even applying the Seventh Circuit's broader approach, O'Donnell cannot show that accused father's criminal case was resolved completely in his favor. Certainly, the case against him had yet to end in either an acquittal or dismissal. Moreover, although O'Donnell states in her brief that "Mr. Parsons' charges were . . . dismissed," the criminal record indicates that the case terminated solely due to her father's death. (Attachment B at 1 (Entry of 2/27/2017 "COURT FINDS THAT DEFT IS NOW DECEASED, THAT THIS CASE IS CLOSED."). Neither the criminal docket – nor plaintiffs' complaint – contains facts showing the State dropped Decedent's charges.

Securing post-conviction relief was in this case a crucial prerequisite. But, standing alone, the order granting such relief did not, and could not, without further action, relieve the accused father of the potential jeopardy of a retrial and conviction. Because the accused father

never received the full vindication of a not guilty verdict or the implicit exoneration of a dismissal, there was, in the end, no conclusively favorable outcome.

I therefore grant defendants' motions as to the malicious prosecution claims.

## B.  Common Law Claims

### 1.  O'Donnell States an IIED Claim Against White

O'Donnell brings a representative claim of intentional infliction of emotional distress (IIED) against White. To make out such a claim, she must plead facts sufficient to show:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio App. 1995).

Initially, White argues that the IIED claim fails "because Parsons has not been exonerated of murdering his wife," and, therefore, "his emotional distress claims have not accrued." (Doc. 20 at 12 (citing *Parish v. City of Elkhart*, 614 F.3d 677, 683-84 (7th Cir. 2010)). White effectively argues that, unless the criminal proceedings resolved in the accused father's favor, O'Donnell cannot bring an IIED claim on his behalf. (*See id.*). White identifies no case law from Ohio – or from this circuit – supporting his argument.

O'Donnell, on the other hand, cites a district court decision from this circuit with similar facts. *See LeFever v. Ferguson*, 2013 WL 3742530, *15-16 (S.D. Ohio). In *LeFever*, the court denied summary judgment for the defendant on an IIED claim, but the underlying criminal proceedings did not resolve in plaintiff's favor. *See id.* (granting summary judgment for defendant on malicious prosecution claim).

In light of the court's analysis in *LeFever*, I decline to adopt a requirement that O'Donnell show that the criminal proceedings resolved in her father's favor for the IIED claim to survive.

White also argues that his alleged misconduct – that is, providing Yezzo the incorrect breaker bar for forensic testing – did not cause Decedent's emotional distress. [9] Rather, he argues, BCI's failure to turn over Yezzo's personnel file caused the allegedly wrongful conviction. (Doc. 20 at 12-14 (citing Attachment A)). O'Donnell responds that White's conduct, in conjunction with the Yezzo file's non-disclosure, was a proximate cause of Decedent's emotional distress.

"Proximate cause is 'that which immediately precedes and produces the effect, as distinguished from a remote, mediate, or predisposing cause.'" *Burks v. Torbert*, 2009 WL 280405, *4 (Ohio App.) (quoting *Jeffers v. Olexo*, 539 N.E.2d614 (Ohio 1989)). A plaintiff's harms may result from more than one proximate cause. *See United States v. Hargrove*, 714 F.3d 371, 374-75 (6th Cir. 2013) ("When the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but for cause of the event, . . . the conduct of each is a cause in fact of the event.. . . [T]he same reasoning applies to [proximate cause].") (internal citation and quotations omitted).

First, I note that White's mischaracterizes the scope of O'Donnell's allegations. O'Donnell alleges that White did more than disclose the wrong breaker bar. O'Donnell alleges that White's conducted a wholly flawed investigation, including altering decade-old evidence and discarding evidence bags (Doc. 1 at 7, ¶ 30); engaging with Yezzo despite her reputation for

---

[9] White also argues, for this same reason, that he "is not the proper party" to be sued on the IIED claim. (Doc. 20 at 13).

misconstruing test results (*id.* at ¶ 33); and allowing Yezzo to test the wrong breaker bar (*id.* at 9, ¶ 43) and produce false reports (*id.* at ¶ 44).

Second, I decline to read the state court opinion to limit the proximate cause of the father's emotional distress to one cause. The opinion focuses on the prosecution's *Brady* violation *vis-vis* the personnel file as resulting in an unfair trial. But the court did not conduct a proximate-cause inquiry. Rather, the court found that the jury's verdict, without their knowledge of Yezzo's reputation and conduct issues, made the verdict unworthy of confidence. (*See* Attachment A).

Indeed, the complaint's allegations, taken together, point to aggregate causes of the father's emotional distress. The wrongdoing leading to a now-vacated conviction and years in prison was three-way, not singular. BCI withheld evidence material on the issue of guilt or innocence. That was enough to vacate the conviction.

But that was not all the wrongdoing, according to the complaint. White manipulated the evidence, part of which received inconclusive evaluations from two initial forensic examinations. Once in her hands, Yezzo produce an expert report, the accuracy of which was, at best, highly suspect.

To be sure, the complaint's allegations are just that. Nonetheless I must read them favorably to the plaintiff. Each of the three contributed to the State's three-legged case. Take one away, and, without that missing leg, the conviction – and the emotional distress of imprisonment that every wrongly convicted inmate must endure for his entire term – would not have occurred.

Accordingly, I deny the City defendants' motion to dismiss the IIED claim.

## 2. O'Donnell States a Claim Against White for Wrongful Death

O'Donnell also brings a representative wrongful death claim against White.

"To maintain a wrongful death action . . ., a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 529 N.E. 2d 449, 454 (Ohio 1988).

White attacks the causation element in the same way he attacked O'Donnell's IIED claim. (*See* Doc. 20 at 14 ("[T]he misconduct attributed to Defendant White in the Complaint did not produce the wrongful conviction, nor are there allegations in the Complaint that he was a participant in the conduct that did . . . [T]hose facts negate . . . the wrongful death claim as a matter of law.")). O'Donnell responds that "[p]roximate cause does exist, because Defendant White's violations of Mr. Parsons' [*sic*] rights caused his wrongful conviction, and his wrongful conviction caused his health to deteriorate until it killed him." (Doc. 26 at 18).

I agree with O'Donnell that the complaint sufficiently alleges causation.

The Ohio Supreme Court has explained:

> The rule of proximate cause "requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act."

*Jeffers v. Olexo*, 539 N.E.2d 614, 617-18 (Ohio 1989) (quoting *Ross v. Nutt*, 203 N.E.2d 118, 120 (Ohio 1964)).

"The notion of foreseeability is intertwined with the concept of duty and proximate cause." *Hunt v. Marksman Prods.*, 656 N.E.2d 726, 728 (Ohio App. 1995) (internal citation omitted). Therefore, O'Donnell's complaint must allege facts to demonstrate that her father's death resulted as a foreseeable consequence of White's actions.

In *In re Heparin*, I found that a wrongful death plaintiff failed to "adequately allege proximate causation." 2010WL 547322, *2 (N.D. Ohio) (Carr, J.). The complaint in that case "vaguely referr[ed] to" defendant's actions and its resulting product recall. Then, the complaint "summarily state[d] that decedent's injuries and death resulted '[a]s a direct and proximate result'" of those actions. *Id.* Finding "no more than 'formulaic recitation of the elements of a cause of action,'" I dismissed the complaint. *Id.* at *3 (quoting *Twombly*, *supra*, 550 U.S. at 555).

O'Donnell alleges that White's conduct worked in tandem with others' misconduct, resulting in her father's allegedly wrongful conviction and incarceration. This caused him "decades of stress and depression," which, according to the complaint, exacerbated his "chronic heart problems." (*See* Doc. 1 at 17, ¶¶ 88, 91). His worsening heart conditions, the complaint alleges, resulted in his premature death. (*Id.* at 17, 21 ¶¶ 91, 106). The complaint further alleges that the father's "death was the foreseeable and natural consequence of the actions of Defendant White." (*Id.* at 21, ¶ 107).

This is more than a formulaic recitation of the elements of a wrongful death cause of action. Rather, O'Donnell's complaint contains factual allegations that, when viewed in the light most favorable to her, link White's conduct to her father's death.[10] Therefore, while the ultimate resolution of her claim awaits another day, I find that O'Donnell has sufficiently alleged a wrongful death claim. I deny the City defendants' motion as to that claim.

### 3. Plaintiffs State a Loss of Consortium Claim Against the City Defendants

Plaintiffs bring a personal loss of consortium claim against the City Defendants.

---

[10] I note that it is of no consequence that the father suffered from heart conditions that may have been unknown to White. *See* Restatement of Torts 2d § 461 ("The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct.").

"[A] cause of action for loss of consortium is a derivative action." *Messmore v. Monarch Mach. Tool Co.*, 463 N.E.2d 108, 110 (Ohio App. 1983). This means that a claim for loss of consortium "is dependent upon the existence of a primary cause of action and can be maintained only so long as the primary action continues." *Id.*

The City Defendants first argue that the loss of consortium claim must be dismissed because the primary claims on which it is based do not survive. (Doc. 20 at 14-15). But, as explained above, the *Brady* claim and wrongful death claim remain against the City, and the IIED claim and wrongful death remain against White. I therefore cannot dismiss the loss of consortium claim on that ground.

The City also argues that it is entitled to statutory immunity under O.R.C. § 2744.02. That statute provides that, "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." Ohio Rev. Code § 2744.02(A)(1). Municipalities enjoy this immunity subject to certain exceptions. *See id.* at § 2744.02(B)(1)-(5). The City argues that none of the listed exceptions applies in this case.

Plaintiffs do not argue that a statutory exception undermines the City's immunity. (*See* Doc. 26 at 14). Rather, they argue that, because constitutional claims remain against the City, the Ohio statute provides no protection. (*Id.* (citing Ohio Rev. Code § 2744.09(E))).

Insofar as the loss of consortium claim rests upon the *Brady* claim against the City, I agree with plaintiffs that the City is not immune. *See Boyer v. Lacy*, 665 Fed. App'x 476, 485 (6th Cir. 2016) (recognizing loss of consortium claims based on § 1983 claims). "[T]he immunity granted by R.C. Chapter 2744 does not apply to 'alleged violations of the constitution

or statutes of the United States.'" *Stevens v. Cox*, 2009 WL 223897, *16 (Ohio App.) (quoting O.R.C. § 2744.09(E)).

The wrongful death claim, however, is a common law claim. Plaintiffs "cannot maintain a derivative loss of consortium claim based upon any claim for which immunity is appropriate." *H.M. v. Bd. Of Education of the Kings Local School District*, 117 F. Supp. 3d 992, 1016 (S.D. Ohio 2015) (holding plaintiffs could not bring loss of consortium claim against public school employees based on IIED claim). Accordingly, plaintiffs cannot maintain a loss of consortium cause of action against the City based on the wrongful death claim. *See* Ohio Rev. Code § 2744.02(A)(1).

I therefore grant the City Defendants' motion in part and deny it in part as to the loss of consortium claim.

### 4.        Plaintiffs Do Not State a NIED Claim

Finally, plaintiffs bring a personal claim of negligent infliction of emotional distress (NIED) against White.

For their NIED claim to survive, plaintiffs must plead sufficient facts to show: "(1) The plaintiff witnessed and/or experienced a real or impending danger to another, (2) the defendant's conduct negligently caused the dangerous incident, and (3) the defendant's conduct was the proximate cause of plaintiff's serious and reasonably foreseeable emotional distress." *Stout v. United States*, 721 Fed. App'x 462, 473 (6th Cir. 2018) (quoting *David v. Matter*, 96 N.E.3d 1012 (Ohio App. 2017) (internal quotations omitted)).

White argues that he is immune from the NIED claim. Municipal employees are generally immune from claims based on negligence. O.R.C. § 2744.03(A)(6). Such employees are not immune, however, from NIED claims raised "by a bystander . . . so long as the bystander

also alleges the employee actions met one of the higher standards of intent identified in R.C. 2744.03(A)." *David*, *supra*, 96 N.E. 3d at 1019.

Municipal employees are not immune from liability based on their reckless conduct. O.R.C. § 274.03(A)(6)(b). Plaintiffs assert that White acted recklessly (Doc. 1 at 21-22, ¶ 119), so that White is not immune from the NIED claim. *David*, *supra*, 96 N.E. 3d at 1019 (holding municipal employees were not immune from NIED claim based on recklessness).

Moreover, the recklessness allegation does not, as the City Defendants argue, convert plaintiffs' NIED claim into an IIED claim. *See id.* (analyzing bystander claim based on recklessness as NIED claim).

The parties dispute whether plaintiffs have sufficiently alleged an emotional injury. I find that they have not.

"[T]he same standard [applies] for establishing emotional distress in negligent infliction of emotional distress actions and intentional infliction of emotional distress [actions]." *Swartz v. DiCarlo*, 2014 WL 4955801, *5 (N.D. Ohio) (Boyko, J.) (citing *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666 (Ohio 1983)), *Welling v. Weinfeld*, 113 Ohio St.3d 464 (Ohio 2007).

. Accordingly, plaintiffs must allege facts demonstrating an "emotional injury which is both severe and debilitating." *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983). "[S]erious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Id.* Examples of such an injury include: "traumatically induced neurosis, psychosis, chronic depression, or phobia." *Id.* (internal citation omitted).

The court in *Swartz* dismissed plaintiff's IIED claim applying the same emotional injury standard as that used in NIED claims. The plaintiff in that case alleged "that he suffered 'severe emotional distress' and nothing else. There are no specifics as to how he suffered." 2014 WL 4955802 at *4. ("Where is the claim of sleepless nights, inability to work for a period of time, or the close familial or personal relationships have suffered serious strain due to the additional stress from the situation, or the 'change in habitual makeup?'").

Similarly, plaintiffs allege in their Complaint that they "have suffered and continue to suffer severe and debilitating emotional distress." (Doc. 1 at 22, ¶ 120). They allege no facts showing how they suffered. Rather, in their motion, they point to the events they witnessed, including their father's charge for murdering their mother, the jury's guilty verdict in that case, losing their father's company during his incarceration, and their father's emotional deterioration until his death. (*See* Doc. 26 at 17). Traumatic events, no doubt, but these facts support a separate element: that plaintiffs witnessed danger to another.

The Complaint simply fails to include facts demonstrating an emotional injury, and, for that reason, I must grant the City Defendants' motion as to the NIED claim. *See Peters v. Monroe Township Bd. of Trustees*, 2011 WL 3652719, *7 (S.D. Ohio) (dismissing emotional distress claim where plaintiffs alleged they suffered "severe emotional distress").

**Conclusion**

It is, therefore,

ORDERED THAT

Defendants G. Michelle Yezzo, Daniel Cappy, and John Lenhart's motion to dismiss (Doc. 13) be, and the same hereby is, granted.

It is further ORDERED THAT

Defendants Charles Michael White and City of Norwalk's motion for judgment on the pleadings (Doc. 20) be, and the same hereby is, granted in part and denied in part.

So ordered.

<u>/s/ James G. Carr</u>
Sr. U.S. District Judge