IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - -

| | |
|---|---|
| DEBRA O'DONNELL, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 3:17-CV-2657 |
| | ) Judge James G. Carr |
| | ) |
| G. MICHELE YEZZO, et al., | ) |
| | ) |
| Defendants. | ) |

- - -

THE DEPOSITION OF DANIEL CHILTON

TUESDAY, JANUARY 28, 2020

- - -

The deposition of DANIEL CHILTON, a witness, called for examination by the Plaintiffs, under the Federal Rules of Civil Procedure, taken before me, Kristine M. Esber, a Notary Public within and for the State of Ohio, pursuant to Notice, at the BCI Main Offices, 1560 State Route 56 SW, London, Ohio, commencing at 1:33 p.m., the day and date above set forth.

- - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK BUILDING, SUITE 440
1360 WEST NINTH STREET
CLEVELAND, OHIO 44113
(216) 621-2550
email:  hoffmastercourt@aol.com

- - -

Page 2

1    APPEARANCES:

2    On behalf of the Plaintiffs:

3         ALPHONSE A. GERHARDSTEIN, ESQ.
          Gerhardstein & Branch, Co. LPA
4         441 Vine Street, Suite 3400
          Cincinnati, Ohio  45202
5         (513) 621-9100
          email:  agerhardstein@gbfirm.com

6

7    On behalf of the Defendants City of Norwalk and Officer
     Charles Michael White:

8
          BYRON S. CHOKA, ESQ., BY TELEPHONE
9         Spengler Nathanson, PLL
          900 Adams Street
10        Toledo, Ohio 43604
          (419) 252-6208
11        email:  bchoka@snlaw.com

12   On behalf of Former Defendants Daniel Cappy, G. Michele
     Yezzo and John Lenhart:

13
          THOMAS E. MADDEN, ESQ., BY TELEPHONE
14        Ohio Attorney General
          150 East Gay Street, 16th Floor
15        Columbus, Ohio  43215
          (614) 644-7233
16        email:  thomas.madden@ohioattorneygeneral.gov

17        ZAHID H. SIDDIQI, ESQ.
          Chief Counsel, BCI
18        1560 State Route 56 SW
          London, Ohio  43140
19        (740) 845-2185
          email:  zahidsiddiqi@ohioattorneygeneral.gov

20

21                         - - -

22   Also Present:

23        Linda Dill

24                         - - -

25

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 3

1                              INDEX

2                                               PAGES

3    CROSS-EXAMINATION BY

4        MR. GERHARDSTEIN                         4

5                         - - -

6    PLAINTIFFS' EXHIBITS MARKED

7        48                                       31
         49                                       33
8

9                          - - -

10   OBJECTIONS BY

11       MR. MADDEN           12, 13, 15, 23, 24, 25,
                              26, 27, 35, 37(2), 39
12

13       MR. CHOKA           24, 36, 38

14                          - - -

15

16

17

18

19

20

21

22

23

24

25

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

```
                                                      Page 4
 1                      DANIEL CHILTON
 2  a witness, called for examination by the Plaintiffs,
 3  under the Rules, having been first duly sworn, as
 4  hereinafter certified, deposed and said as follows:
 5                    CROSS-EXAMINATION
 6  BY MR. GERHARDSTEIN:
 7  Q.     Good afternoon.  State your name, please.
 8  A.     Daniel Lee Chilton, C-H-I-L-T-O-N.
 9  Q.     And where do you work?
10  A.     I'm retired.
11  Q.     Good for you.
12  A.     Yes.
13  Q.     What was the last job you did?
14  A.     I've had so many through the years.  The last
15  official -- I retired in 1999 from the Milford Police
16  Department.
17  Q.     And what did you do for the Milford Police
18  Department?
19  A.     I was the police chief of the city.
20  Q.     How long did you do that?
21  A.     Five years.
22  Q.     And prior to being the Milford Police Chief what
23  did you do?
24  A.     I was the police chief of Moraine,
25  M-O-R-A-I-N-E, Ohio.
```

1  Q.     Where is that?

2  **A.     The first city outside of Dayton that you're**

3  **entering from Cincinnati.**

4  Q.     How long did you do that?

5  **A.     One year.**

6  Q.     And what did you do before that?

7  **A.     Worked for BCI.**

8  Q.     And what did you do for BCI?

9  **A.     I had three different duties.  The first one was**

10 **the assistant superintendent of BCI.  And I served a**

11 **year in the interim superintendent position.  Within**

12 **that year I was also assigned as the director of the**

13 **Ohio Police Officer Academy training.**

14 Q.     And that gave you double pay?

15 **A.     No, unfortunately.**

16 Q.     All right.  What years did you do that?

17 **A.     Milford Police Chief?**

18 Q.     Well, you said that was '99.  How about the BCI

19 jobs?

20 **A.     '87 to '92.**

21 Q.     While you were at BCI can you just tell me what

22 the table of organization was from the top down to the

23 forensic scientist?

24 **A.     Superintendent, of course.**

25 Q.     Okay.

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

1  **A.    Assistant superintendent, which was myself.  The**

2  **person -- criminal investigations, drug agents, the**

3  **name was Terry Neally, he was in charge of those.  The**

4  **person in charge of the laboratories was Michael**

5  **Yarchak.  And then we had the fingerprint**

6  **identification section, and I cannot recall his name.**

7  Q.    And those people, the criminal investigation,

8  the lab, and the fingerprint section were all direct

9  reports to you?

10  **A.    Correct.**

11  Q.    Any other direct reports to you?

12  **A.    Not that I recall.**

13  Q.    And the lab director was responsible for the

14  forensic scientists?

15  **A.    Correct.**

16  Q.    Were they called that or were they called

17  criminalists when you worked there?

18  **A.    Criminalists.**

19  Q.    And those were civil service jobs or classified

20  civil service?

21  **A.    I presume.**

22  Q.    Were you in the classified or unclassified

23  section?

24  **A.    Unclassified.**

25  Q.    What did you do before '87?

1  **A.      I was the police chief of Fairfax, Ohio.**

2  Q.      How long did you do that?

3  **A.      Five years.**

4  Q.      And prior to that?

5  **A.      Same capacity, I was assistant chief during**

6  **that process.  I did that for probably from about '77**

7  **to '83.**

8  Q.      Assistant chief at Fairfax?

9  **A.      Yes.**

10  Q.      And what about before that?

11  **A.      Simple patrolman within Fairfax.**

12  Q.      How did you get the job at BCI?

13  **A.      A former superintendent, his name is Paul**

14  **Ferrara, F-E-R-R-A-R-A, he was the police chief of**

15  **Fairfax.  He left Fairfax and became the superintendent**

16  **of BCI.  He hired me from my capacity as -- after he**

17  **left I was promoted to chief, but then he, being Paul**

18  **Ferrara, hired me as the assistant superintendent.**

19  Q.      Did you have any experience in the forensic part

20  of the work at the lab prior to joining BCI?

21  **A.      No.**

22          MR. GERHARDSTEIN:          Anyone know what

23          the beeping is?

24          MS. MOORE:          I do not.

25                  (Thereupon, there was a discussion

1    off the record.)

2  BY MR. GERHARDSTEIN:

3  Q.    What were your duties as the assistant

4  superintendent?

5  **A.    Basically in charge of all divisions,**

6  **identification, which is fingerprints of course, drug**

7  **unit, which encompassed crime scene investigation, the**

8  **laboratories, there were three laboratories at the**

9  **time.  They would report to me on the significant**

10 **issues.**

11 Q.    What were the three laboratories?

12 **A.    Primary here in London, Richfield, Ohio around**

13 **Cleveland, and the third was Fremont, Ohio.**

14 Q.    Did you get involved in the supervision and

15 evaluation of forensic scientists yourself?

16 **A.    No.**

17 Q.    That was left to Mr. Yarchak --

18 **A.    Correct.**

19 Q.    -- and his direct reports?

20 **A.    Yes.**

21 Q.    Now, were there any people that reported

22 directly to Mr. Yarchak?

23 **A.    His assistant, and forgive me, I don't remember**

24 **his name.**

25 Q.    Was it Cappy?

1  **A.      Yes, Daniel Cappy.**

2  Q.     And that was the immediate supervisor, Dan Cappy

3  was the immediate supervisor of the criminalists?

4  **A.      Yeah, right under Dr. Yarchak.**

5              MR. GERHARDSTEIN:       We're getting

6              phone calls and beeps out of the phone.

7              Can you put a mute on or something?

8              MR. MADDEN:           Yeah, I'll try.

9              MR. GERHARDSTEIN:       Thanks.

10 BY MR. GERHARDSTEIN:

11 Q.     Was Ferrara there the whole time you were there?

12 **A.      Yes.  With that one exception when he got**

13 **dismissed, he left.  I became the superintendent.  And**

14 **that was approximately one year.**

15 Q.     And who replaced you as superintendent?

16 **A.      I don't recall.**

17 Q.     Was it Lenhart?

18 **A.      Yes, John Lenhart.**

19 Q.     And why did Ferrara get dismissed?

20 **A.      Political reasons as I understand it.  It was a**

21 **change in the attorney general.**

22 Q.     So what year was that?

23 **A.      I don't recall the year.**

24 Q.     But you resigned in November of '92.  So was it

25 in '91 that you became the superintendent?

Page 10

1   **A.      Yes, '91 would be a good answer.**

2   Q.      Did you know Lenhart at all?

3   **A.      Only as a boss.**

4   Q.      When was he your boss?

5   **A.      When he was the superintendent of BCI.**

6   Q.      So let me get this straight.  Did you become the

7   acting superintendent, and then he came in before you

8   resigned; Lenhart actually took over before you

9   resigned?

10  **A.      Correct, he did.**

11  Q.      All right.  So how long were you the acting

12  superintendent?

13  **A.      About eight months.**

14  Q.      And then Lenhart came in?

15  **A.      Then Lenhart came in as director of BCI.**

16  Q.      Okay.  And how long did you stay on after

17  Lenhart came on?

18  **A.      Approximately one year.**

19  Q.      Why did you resign?

20  **A.      Being hired as the police chief of Moraine,**

21  **Ohio.**

22  Q.      What did you like about being the police chief

23  versus being an assistant superintendent?

24  **A.      About the same.  Not much difference one way or**

25  **another.**

Page 11

1  Q.     While you were at BCI were you aware of any

2  training provided to BCI employees about testifying?

3  **A.     Not that I'm aware of.**

4  Q.     Many BCI employees did testify as part of their

5  jobs, right?

6  **A.     Correct.**

7  Q.     Was there a section or a unit or some group that

8  was responsible for training within BCI?

9  **A.     No.**

10 Q.     How were BCI employees supposed to learn how to

11 do their jobs?

12 **A.     There was a director of the identification**

13 **section, fingerprint identification.  His name almost**

14 **came to me.  And he was in charge of all the ID techs,**

15 **fingerprints, Avis, and he and others in his division**

16 **trained new employees.**

17 Q.     Okay.  So the director and co-workers would

18 train the new employees.  What about in the forensic

19 labs?

20 **A.     Michael Yarchak.**

21 Q.     And if I were to find a job description for

22 Yarchak, would it include that he was supposed to train

23 his employees?

24 **A.     As I recall, yes.**

25 Q.     Do you know where he is now?

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 12

```
 1   A.      I do not.
 2   Q.      You don't have alumni gatherings?
 3   A.      No.
 4   Q.      Did you ever observe any of the training that
 5   Michael Yarchak provided to people in the labs?
 6   A.      I did not.
 7   Q.      Now, with your police background you were
 8   familiar with the Supreme Court case of Brady versus
 9   Maryland which talked about a duty to turn over
10   exculpatory information if a law enforcement agency or
11   prosecutor had it, right?
12   A.      I don't recall.
13   Q.      That's a --
14               MR. MADDEN:            Objection.
15               THE NOTARY:            Who was that?
16               MR. MADDEN:            Mr. Madden,
17               objection.
18               THE NOTARY:            Thank you.
19               MR. GERHARDSTEIN:      It might be
20               helpful to just say your name just so she
21               doesn't have to try to figure it out since
22               two of you are on the phone.  Okay?
23               MR. MADDEN:            Sure.
24               MR. GERHARDSTEIN:      Okay.  Thank
25               you.
```

Page 13

1  BY MR. GERHARDSTEIN:

2  Q.    Brady versus Maryland was in 1963, a United

3  States Supreme Court case.  And it talked about the

4  duty to give prosecutors exculpatory information.  Does

5  that ring any bells at all?

6  **A.    I wasn't employed as a police officer in 1963.**

7  Q.    Right.  But it continued to guide law

8  enforcement agencies all the way up until the present.

9  **A.    Okay.  I was unfamiliar with that provision.**

10           MR. MADDEN:              I'm going to

11           have a continuous objection to this line

12           of questioning.  This is Tom Madden.

13  Q.    Are you aware of any protocol that was

14  established at BCI for complying with the duty to turn

15  over exculpatory information or impeachment evidence to

16  prosecutors?

17  **A.    Unaware.**

18  Q.    Okay.  In the course of your work did you ever

19  have any conversation with individual employees who

20  were subpoenaed as to their obligations under Brady or

21  the United States Supreme Court case of Bagley

22  regarding exculpatory or impeachment evidence?

23  **A.    I do not recall.**

24  Q.    Did you know Michele Yezzo?

25  **A.    Yes.**

Page 14

1  Q.     How long did you know her?

2  **A.     Through the period that I was there, which was**

3  **five years, '87 to '92.**

4  Q.     Did you know anything about the quality of her

5  work?

6  **A.     No.**

7  Q.     Did you ever become aware of any problems she

8  was having with her job performance?

9  **A.     Just word of mouth through Dr. Yarchak, Dan**

10 **Cappy, and any other employees within the laboratory**

11 **division.**

12 Q.     So what's your best recollection of what you

13 learned from Yarchak, Cappy, and these other employees?

14 **A.     Michele was quite outspoken and independent and**

15 **was unmanageable at times.**

16             THE WITNESS:            May I take a

17             break to go to the restroom?

18             MR. GERHARDSTEIN:            Absolutely.  Any

19             time you need a break, that's fine.

20                  We're off the record.

21                  (Thereupon, there was a recess.)

22 BY MR. GERHARDSTEIN:

23 Q.     I was asking about Michele Yezzo.  And my

24 question was, what did you know about issues regarding

25 her performance.  And you were starting to give us your

1    answer.

2    **A.     Michele and I had relatively little interaction**

3    **one way or another.  I was not her direct boss, just**

4    **through the laboratory, through the chain of command of**

5    **Dr. Yarchak and Dan Cappy.  And that was it.  She**

6    **didn't report to me.  I didn't evaluate her work or**

7    **anything.**

8    Q.     What concerns did Dr. Yarchak express about her?

9    **A.     The best way to describe Michele is she was**

10   **different.**

11   Q.     That's pretty broad.

12   **A.     Very broad.**

13                   MR. MADDEN:                 Object.  This is

14                   Thomas Madden, objection.

15   BY MR. GERHARDSTEIN:

16   Q.     All right.

17   **A.     Hard to deal with, very opinionated.  I believe**

18   **she was an outstanding criminalist.**

19   Q.     And how did you know that -- were you saying you

20   thought she was an outstanding criminalist or she did?

21   **A.     She did.**

22   Q.     Okay.  And was that view shared by Dr. Yarchak?

23   **A.     I believe so, yes.**

24   Q.     And was that view shared by Mr. Cappy?

25   **A.     I believe it was.**

1    Q.     And did you ever have occasion to know how they

2    evaluated her work?

3    A.     **None whatsoever.**

4    Q.     Did you know whether there was any system of

5    peer review in the lab at the time?

6    A.     **No, I do not.**

7    Q.     Did you know whether there was any system of

8    quality assurance in the lab at the time you were the

9    assistant director?

10   A.     **I do not.**

11   Q.     Did you ever call for a program of quality

12   assurance in the lab?

13   A.     **I did not.**

14   Q.     While you were the assistant director did you

15   become aware of any system by which supervisors would

16   actually look at the actual scientific work of the

17   criminalist?

18   A.     **As a superintendent or assistant I did not.**

19   Q.     Did you have any conversations with Mr. Cappy

20   regarding Michele?

21   A.     **I do not recall.**

22   Q.     Did you make any records of your conversations

23   with either Yarchak or Cappy about Michele?

24   A.     **I did not.**

25   Q.     Did you have any conversations with union

1   representatives about Michele?

2   **A.      I did not.**

3   Q.      Did there come a time when you thought that

4   Michele Yezzo had mental health issues?

5   **A.      No, I do not.**

6   Q.      I'm going to ask you in this exhibit book to

7   open up to Exhibit 23.  Do you recognize this document?

8           You can take time to read it.

9   **A.      Okay.  I recognize the memo.**

10  Q.      Okay.

11  **A.      I sent it to the superintendent Paul Ferrara.**

12  Q.      All right.  And you authored this memo?

13  **A.      I did.**

14  Q.      And apparently it followed a meeting with Ron

15  Dye, Cheryl Siler, Ken Ross, and Dave Laux; is that

16  right?

17          Do you remember that meeting?

18  **A.      I do not remember the meeting.**

19  Q.      Okay.  In the second paragraph you said that the

20  union had made a request that management seek a medical

21  examination of Michele because, as they say in the

22  third paragraph, they thought she suffered from a

23  severe mental imbalance.  Do you see that?

24  **A.      (Indicating.)**

25  Q.      The second paragraph says, specifically

1    requested that we impose a medical examination.

2    **A.     I see that, yes.**

3    Q.     Okay.  And then down in the third paragraph it

4    says, according to the individuals present at the

5    meeting it's the consensus of opinion in the micro

6    section that Michele suffered a severe mental imbalance

7    and needs immediate assistance.

8    **A.     I see that, yes.**

9    Q.     So did you have any reason to agree or disagree

10   with their consensus?

11   **A.     I had no reason to.**

12   Q.     It was unusual for the union to be calling for a

13   member of the bargaining unit to be mentally evaluated,

14   right?

15   **A.     I would agree.**

16   Q.     In your years as assistant superintendent did

17   anybody else get referred to management for evaluation

18   of a mental problem?

19   **A.     I do not recall.**

20   Q.     And then you went on to list several facts that

21   were offered in support of their position.  They said

22   in number 1 that the micro section is a revolving door,

23   in part because of -- that there was a revolving door

24   because of Michele.  Did you do anything to verify

25   that?

Page 19

1  **A.      No, I did not.**

2  Q.     And then in 1A it says that there was

3  never-ceasing conflicts, run-ins, confrontations, and

4  battles that are taking its toll.  Did you do anything

5  to verify that?

6  **A.      I did not verify it, but I vaguely recall**

7  **speaking to Dr. Yarchak or Cappy about the situation.**

8  **She was quite notorious.**

9  Q.     So those conversations confirmed that she was

10  the source of interoffice disruption?

11  **A.      Correct.**

12  Q.     They actually go on in C, or you've documented

13  that no one has successfully completed a training

14  program under her guidance.  Did I read that correctly,

15  the first line in C?

16  **A.      I see it.  I do not recall.**

17  Q.     All right.  But, again, this is a memo you

18  wrote, right?

19  **A.      Yes.**

20  Q.     D says that employees have expressed a fear of

21  Michele, their opinion is based on threats of Michele

22  making statements she will get a gun.  The assumption

23  is she was either use the gun on herself or others.

24  Did I read that correctly?

25  **A.      You did.**

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

1  Q.     And does this refresh your recollection as to

2  the fear that other employees had of Michele?

3  **A.     Vaguely.**

4  Q.     And the notion that there could be workplace

5  violence with a gun is pretty alarming, right?

6  **A.     Yes.**

7  Q.     And did you take it seriously?

8  **A.     I don't recall.**

9  Q.     E says that she has a personality or behavior

10 that's like a roller coaster, ups and downs, highs and

11 lows, excessive arguments, battles and conflicts.  Did

12 you verify that in any way?

13 **A.     Only through her direct supervision of**

14 **Dr. Yarchak or Daniel Cappy.**

15 Q.     And your conversations with them confirmed this

16 fact?

17 **A.     That's correct.**

18 Q.     And F says that she had been observed to break

19 down with spells of sobbing for no apparent reason.

20 **A.     I do not recall that.**

21 Q.     And then G, constantly intimidates fellow

22 employees with abusive language such as calling them

23 bitches and assholes and flips the bird to co-workers

24 without provocation.  Did your conversations with

25 Yarchak and Cappy confirm that?

1  **A.      As I recall it does actually reflect his**

2  **statement or their statements.**

3  Q.      And if I get this right, this whole memo is

4  summarizing allegations that were relayed to you by

5  this group of employees that you named in the first

6  paragraph, right?

7  **A.      Correct.**

8  Q.      Is this the first you had heard that there was

9  any problems with Michele?

10  **A.      No.**

11  Q.      Had you had similar meetings in the past with

12  FOP representatives and BCI employees complaining about

13  Michele's conduct?

14  **A.      My memory reflects complaints made about her,**

15  **but no union representation, nothing from the union.**

16  **Just comments basically from the section where she was**

17  **assigned and her immediate supervisors.**

18  Q.      Prior to composing this memo did you ever have

19  any meetings with Michele?

20  **A.      Not that I recall.**

21  Q.      After composing this memo did you ever have any

22  meetings with Michele?

23  **A.      Not that I recall.**

24  Q.      Were you ever part of any face-to-face session

25  that included Michele that involved her conduct?

Page 22

1    **A.      No.**

2    Q.     This goes on to say in H, in the past had

3    intentional physical conduct short of assault with a

4    fellow employee Ron Dye.  Do you know what that was

5    referring to?

6    **A.      I do not.**

7    Q.     Was there an incident where a key on a metal

8    plate was thrown at an employee?

9    **A.      I do not recall that incident.**

10   Q.     And this those goes on to say, has told

11   supervisor Dan Cappy fuck you for no apparent reason.

12   Was that confirmed by Dan Cappy?

13   **A.      I don't recall.**

14   Q.     Now, on I, it names two people and says, have

15   both sought professional counseling in order to cope

16   with the fears and frustrations.  A request was made to

17   review, and it names the employee's exit interview as

18   it may state that management's lack of action against

19   Michele was a noted reason for her resignation.  Do you

20   know whether you ever checked that employee's exit

21   interview?

22   **A.      I do not.**

23   Q.     Did you ask Cappy to do that?

24   **A.      I do not recall.**

25   Q.     Now, in J it goes on to say, the consensus is

Page 23

```
 1   that Michele's perceived problems affects her overall
 2   performance.  Her findings and conclusions regarding
 3   evidence may be suspect.  She will stretch the truth to
 4   satisfy a department.  Did I read that correctly?
 5   A.      You did read it correctly.
 6   Q.      And this is part of the memo you wrote?
 7                   MR. MADDEN:              This is Tom
 8                   Madden.  I'm going to lodge an objection.
 9   A.      It is part of the memo.
10   Q.      And did you identify that consensus as a
11   consensus from the people you were meeting with?
12   A.      I did not.
13   Q.      So what did you mean when you said the consensus
14   is that Michele's perceived problem affects her overall
15   performance?
16   A.      I don't specifically recall.  I just base that
17   word and that the consensus is she has problems and it
18   reaches every party that she deals with in the lab.
19   Q.      And when you say it reaches every party that she
20   deals with, that included her performance as a forensic
21   scientist, correct?
22   A.      Correct.
23                   MR. MADDEN:              This is Tom
24                   Madden.  I want to note a continuous
25                   objection.
```

Page 24

1  BY MR. GERHARDSTEIN:

2  Q.    Okay.  Her findings and conclusions regarding

3  evidence may be suspect.  Did I read that correctly?

4  **A.    You did.**

5  Q.    And what was the source of that statement?

6  **A.    I don't recall.**

7  Q.    Did that come from any analysis of the issues

8  that you made?

9  **A.    None.**

10  Q.    And did it come from observations brought to you

11  by the people you were meeting with and named in the

12  first paragraph of the memo?

13  **A.    Yes.**

14  Q.    Did you confirm that and discuss that statement

15  with Cappy and/or Yarchak?

16  **A.    I'm sure I did.**

17  Q.    All right.  And so you would not have included

18  that in this memo to the superintendent if you hadn't

19  checked that allegation out with Yarchak or Cappy,

20  right?

21  **A.    Correct.**

22       MR. CHOKA:              Objection,

23       Choka.

24       MR. MADDEN:             Same objection.

25       Madden.

Page 25

1    BY MR. GERHARDSTEIN:

2    Q.      The last sentence says she will stretch the

3    truth to satisfy a department.  What's the source of

4    that statement?

5    **A.      Can you refer me to the page?**

6    Q.      The last sentence of J --

7    **A.      Okay.**

8    Q.      -- on the second page says, she will stretch the

9    truth to satisfy a department.  Do you see that?

10   **A.      I do see it.  I can only assume I responded and**

11   **referred that information to the superintendent based**

12   **on what I was told from her supervisors.**

13   Q.      Was there ever any investigation --

14                   MR. MADDEN:                 Madden,

15                   objection.

16   Q.      Was there any ever any investigation of that

17   allegation that she would stretch the truth to satisfy

18   a department?

19   **A.      Not to my knowledge.**

20   Q.      In the last paragraph of that page it says

21   basically the union has placed us on notice that they

22   consider management ineffective and unconcerned in

23   controlling Michele.  Did I read that correctly?

24   **A.      You did.**

25   Q.      So did you agree that Yarchak and Cappy had been

1  ineffective and unconcerned up to that point?

2  **A.    I don't recall that issue.**

3  Q.    Because this was a pretty serious set of

4  allegations, right?

5  **A.    I agree.**

6  Q.    Now, on the top of the third page of this letter

7  it says, the feelings and attitudes are shared by all

8  of the labs, not merely London.  Did I read that

9  correctly?

10  **A.    Correct.**

11  Q.    And did you do anything to confirm how

12  widespread these feelings and attitudes about Michele

13  Yezzo were?

14  **A.    I did not.**

15  Q.    So what was the basis for that sentence?

16  **A.    Information relayed to me from Dr. Yarchak,**

17  **Dan Cappy.**

18                    MR. MADDEN:                    Madden,

19                    objection.

20  BY MR. GERHARDSTEIN:

21  Q.    In the third to last paragraph it says they

22  believe.  Do you see that?

23  **A.    Yes, I do.**

24  Q.    They believe we can address the issue and force

25  a medical examination and will support us through this.

1  Did I read that correctly?

2  **A.     Yes, you did.**

3  Q.     Did you agree that a forced medical examination

4  would be responsive to the problem?

5  **A.     I don't recall.**

6  Q.     So you end the letter asking Superintendent

7  Ferrara, you say, please advise how you wish this to be

8  handled, right?

9         The very last sentence.

10  **A.     I did say that.**

11  Q.     Okay.  So you were basically giving him all the

12  facts you had, passing it on to him and asking him what

13  you should do.

14  **A.     Correct.**

15  Q.     And what was his response?

16  **A.     I don't recall.**

17                 MR. MADDEN:              Madden,

18                 objection.

19  BY MR. GERHARDSTEIN:

20  Q.     Do you know if he called you or spoke to you or

21  did anything in response to this memo?

22  **A.     I do not.**

23  Q.     Take a look at Exhibit 24, the next exhibit.

24  Now, this is a memo from you as assistant

25  superintendent to Yezzo directly, right?

Page 28

1    A.      Right.

2    Q.      And the subject is written reprimand, right?

3    A.      Correct.

4    Q.      And it's based on your referencing a May 1, 1989

5    incident where you say to Yezzo that she exhibited a

6    lack of control with a co-worker concerning a request

7    from the Scioto County Sheriff's Office, right?

8    A.      I did say that.

9    Q.      Do you have a present recollection of this

10   written reprimand and the basis for it?

11   A.      I do not.

12   Q.      This goes on to say that to date you have

13   received numerous counselings and told further

14   incidents would lead to disciplinary action.  Did I

15   read that correctly?

16   A.      Yes, you did.

17   Q.      And you give a little summary there about a

18   written reprimand in '87 and entries in her performance

19   evaluations in '86, '87, and '88, right?

20   A.      Right.

21   Q.      And you end that paragraph saying, if such

22   conduct continues, further discipline will be taken and

23   could ultimately result in removal from service, right?

24   A.      Correct.

25   Q.      And you also offer her in the next paragraph a

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

1  referral to the employee assistance program, right?

2  **A.      Yes.**

3  Q.      Was this text in this written reprimand

4  something that you came up with?

5  **A.      I don't recall.**

6  Q.      Was the referral to the employee assistance

7  program your idea?

8  **A.      Not that I recall.**

9  Q.      Was it unusual for you as an assistant

10 superintendent to be the one issuing a written

11 reprimand?

12 **A.      It would be.**

13 Q.      Because normally this would come from the direct

14 supervisor, right?

15 **A.      Correct.**

16 Q.      So why were you the one who authored this as

17 opposed to Cappy?

18 **A.      I don't recall the specifics of why.  I presume**

19 **it was because Yarchak or Cappy or both went to the --**

20 **they presented the information to me, and through the**

21 **advice of the superintendent it was assigned to me to**

22 **reprimand.**

23 Q.      So your suggestion is that this came about as a

24 result of a caucussing between the superintendent,

25 Yarchak, you, and Cappy; is that fair?

Page 30

1   A.      That's fair.

2   Q.      I'm going to show you what has been marked as

3   Exhibit 34 and it's Bates number page GB004983.  I've

4   got it here.  And I'm showing you this just to kind of

5   get the system down.  This is a memo from you to a

6   person named Stephanie, the director of personnel.

7   A.      It is.

8   Q.      Okay.  And it's referencing a written reprimand

9   for Michele Yezzo.  And it's dated May 30th of '89,

10  which is the same day as the actual written reprimand

11  that we looked at as Exhibit 24.  Okay.  Are you with

12  me?

13  A.      I'm with you.  I'm having a little difficulty

14  with the time frame.  I don't believe I was with BCI in

15  1999.

16  Q.      This is '89.

17  A.      1989, I'm sorry.

18  Q.      Well, I can tell you that Exhibit 23 is May

19  11th, '89.  That's the memo we just reviewed.  And

20  Exhibit 24 is May 30th, '89.  That's also the memo we

21  reviewed.  So at least there's paperwork that says you

22  were authoring memos in '89.

23  A.      Correct.

24  Q.      I assume we could check the dates of your

25  employment with your administrative -- department of

1    administrative services file.  And do you have any

2    reason to challenge that?

3    **A.**    **I have no reason to challenge that.**

4    Q.    Okay.

5    **A.**    **Because I left BCI that time to become the**

6    **police chief of Moraine in that time frame.**

7    Q.    Actually, just to satisfy your concern, we have

8    a document that I'll show you.

9               (Thereupon, Plaintiffs' Exhibit 48 to

10           the deposition of DANIEL CHILTON was

11           marked for identification.)

12    BY MR. GERHARDSTEIN:

13    Q.    I'll show you Exhibit 48.  Exhibit 48 is a memo

14    dated November 4th, 1993 from the personnel office of

15    BCI.  And it's to the Milford City Finance Director.

16    Okay?

17    **A.**    **M-hm.**

18    Q.    And it says that you were employed at BCI from

19    10-26-87 to 11-6-92 in the capacity of department

20    director.  Does that help you -- does that satisfy your

21    concern about making sure you were with BCI in '89?

22    **A.**    **Yes.  Yes, it does.**

23    Q.    Okay.  So back to Exhibit 34, the page I was

24    directing you to, it's a memo from Chilton to the

25    director of personnel, gB004983, and the subject is

1   written reprimand for Michele Yezzo.  Do you see that?

2   **A.    Oh.**

3   Q.    And it says, attached is the written reprimand

4   which upon final approval will be given to Michele

5   Yezzo.  Mike Yarchak informed me that regarding the May

6   1, 1989 incident Michele was not given counseling.  Did

7   I read that correctly?

8   **A.    Yes, you did.**

9   Q.    So in this time period was it your practice to

10  check discipline out with human resources or the

11  personnel department before acting or was this

12  something special with respect to Yezzo?

13  **A.    Before any discipline was given to anyone, any**

14  **employee, it was run through the superintendent's**

15  **office and his administrative assistant was -- her last**

16  **name was White.  Again, I don't remember her first**

17  **name.**

18  Q.    Okay.  And that includes even a written

19  reprimand?

20  **A.    Yes.**

21  Q.    And that's also so that you would be following

22  progressive discipline appropriately?

23  **A.    Yes.**

24  Q.    So this memo that we're taking a look at is

25  consistent with the practice of making sure that the

Page 33

1  higher-ups approve it?

2  **A.     Correct.**

3                    **(Thereupon, Plaintiff's Exhibit 49 to**

4               **the deposition of DANIEL CHILTON was**

5               **marked for identification.)**

6  BY MR. GERHARDSTEIN:

7  Q.    I'm going to show you what has been marked as

8  Exhibit 49.  And this is a memo GB005032 -- I'm sorry.

9  I don't know why the Bates numbers are screwed up.

10  It's a memo from Michael Yarchak to Daniel Chilton

11  dated May 10th, 1989, subject Michele Yezzo, right?

12  **A.     Right.**

13  Q.    And it has a beginning paragraph, I recommend

14  that BCI should make every effort, and then we have a

15  redaction, right?

16  **A.     That's correct.**

17  Q.    And I'm going to ask for an unredacted copy of

18  this.

19        The third paragraph says, if Yezzo refuses to

20  seek help or is unable to improve regarding her

21  treatment of co-workers, other administrative action

22  should be considered.  Did I read that correctly?

23  **A.     Yes, you did.**

24  Q.    So as we look at this set of memos regarding

25  Michele Yezzo, does that refresh your memory with

1  respect to the concerns that management had for her

2  competency on the job and with her co-workers during

3  the period you were deputy director?

4  **A.    I do not recall.**

5  Q.    So you're not saying anything in these memos is

6  something you contradict, just they aren't triggering a

7  present memory?

8  **A.    Correct.**

9  Q.    Okay.  The memo we looked at at Exhibit 24

10 recommended that she consider -- in fact, the reprimand

11 recommended she consider going to the employee

12 assistance program.  Did she ever go to the employee

13 assistance program?

14 **A.    I'm not aware if she did or did not.**

15 Q.    From the memos that we've just looked at in that

16 period, May of '89 through the period that you resigned

17 as deputy director in '92, did you continue to hear of

18 problems regarding Michele Yezzo?

19 **A.    I don't recall.**

20 Q.    During this period from '89 to the time you

21 resigned in November of '92 were you aware of any duty

22 by BCI employees who testified to share facts that

23 could be used to impeach their testimony with

24 prosecutors when they were called to testify?

25 **A.    I don't recall.  I'm not aware of such an issue.**

Page 35

1  **If there was any matter dealing with that nature that**

2  **you're speaking of, it would be handled by the**

3  **personnel department of BCI downtown.**

4                  MR. MADDEN:                  Objection,

5                  continuous objection to this line of

6                  questioning.

7  BY MR. GERHARDSTEIN:

8  Q.    When an employee would get a subpoena on a case,

9  how was the employee supposed to engage with like

10 personnel or bosses to respond to that?

11 **A.    Just through the chain of command as I recall**

12 **the situation.**

13 Q.    So what does that mean?

14 **A.    It means Dr. Yarchak, Cappy, Carol White**

15 **administrative assistant, and Paul Ferrara.**

16 Q.    See, you're remembering --

17 **A.    I did.**

18 Q.    -- names.  Carol White.  Okay.

19 **A.    M-hm.**

20 Q.    So if the subpoena was for her attendance at a

21 hearing, would that have to run up through the chain of

22 command?

23 **A.    No.**

24 Q.    If the subpoena was for the records related to a

25 case, would that have to run up through the chain of

Page 36

1  command?

2  A.    I don't recall the superintendent's policy,

3  procedure at that time.  Probably, yes.

4  Q.    And do you know what would be included in a

5  response to a subpoena that asked for the records in a

6  case?

7  A.    In regard to reacting to the subpoena, whatever

8  information we had at the time in the personnel file

9  would be given to the requesting department or agency.

10  Q.    So let me make sure that we're talking the same

11  thing.  There's evidence in the record that the

12  prosecutors in Huron County issued a subpoena for the

13  records in the James Parsons murder case.  All right?

14  A.    M-hm.

15  Q.    That was after you left.

16  A.    Okay.

17  Q.    Okay.  But let's assume it was from the period

18  prior to you leaving, just so that I can get the

19  procedure.  So BCI gets a subpoena for the records in a

20  murder case.  Are the records related to that murder

21  case expected to include the forensic work done on the

22  murder case as well as any personnel issues regarding

23  the forensic scientist who worked on the murder case?

24  A.    I agree it would be.

25            MR. CHOKA:              Objection,

Page 37

1          Choka.

2          MR. MADDEN:          Objection,

3          Madden.

4    BY MR. GERHARDSTEIN:

5    Q.    Explain your answer.

6    A.    **Would you repeat what you said to me?**

7    Q.    Would the subpoena for the records in a murder

8    case include the documents that reflected the forensic

9    work done on the case?

10   A.    **Yes.**

11   Q.    And would the response to a subpoena for the

12   records in a murder case also be expected to include

13   matters from the forensic scientist's personnel file

14   that could be used for impeachment testimony or

15   cross-examination in that murder case?

16   A.    **Yes.**

17          MR. MADDEN:          Objection,

18          Madden.

19   Q.    Did you have anything to do with supervising the

20   response to subpoenas for records in the criminal cases

21   that BCI was involved in?

22   A.    **I did not.**

23   Q.    Who would manage that?

24   A.    **Carol White.**

25   Q.    And she worked for the director?

1   **A.      Administrative assistant to the Superintendent**

2   **Ferrara.**

3   Q.      Did she work for both Ferrara and Lenhart?

4   **A.      She was still there when Lenhart came, yes.**

5   Q.      I'm going to show you, sticking with Exhibit 34,

6   Bates number GB004960, and it's a piece of paper with

7   the name Michele Yezzo written on the top.  Do you see

8   that?

9   **A.      Yes, I do.**

10  Q.      Do you know whose handwriting that is?

11  **A.      I do not.**

12  Q.      In 1989 when you were speaking with Yarchak,

13  Cappy, and the superintendent regarding Yezzo did you

14  have any questions as to whether Yezzo's work was

15  sufficiently reliable for her to continue to testify as

16  an expert witness in criminal cases where her testimony

17  could result in felony convictions?

18  **A.      I do not recall.**

19  Q.      If there were concerns about the reliability of

20  her work as she went out and gave testimony, what would

21  have been the appropriate way to determine if she

22  should continue to serve as an expert witness as a BCI

23  employee?

24  **A.      Through the evaluation --**

25                  MR. CHOKA:                  Objection,

Page 39

1          Choka.

2                    MR. MADDEN:              Objection,

3                    Madden.

4    **A.       Through the evaluation of Dr. Yarchak.**

5    Q.    As the lab director?

6    **A.       Correct.**

7    Q.    What's your highest level of education?

8    **A.       I have a Master's Degree.**

9    Q.    In what?

10   **A.       Education.**

11   Q.    From where?

12   **A.       Xavier University, Cincinnati.**

13   Q.    What year?

14   **A.       1980.**

15   Q.    As you sit here today do you have any other

16   recollections of your interactions with or the

17   performance of Michele Yezzo that you haven't shared

18   with us?

19   **A.       No, I do not.**

20   Q.    Have you ever been called to testify in any

21   other case regarding Michele Yezzo?

22   **A.       I have not.**

23                    MR. GERHARDSTEIN:          Okay.  We're

24                    going to take a short break and I'll see

25                    if we got any more.  Okay?

Page 40

```
1              THE WITNESS:              Okay.

2                  (Thereupon, there was a recess.)

3         MR. GERHARDSTEIN:         I don't have any

4         more questions for Mr. Chilton.  Do you

5         have any questions?

6         MR. CHOKA:              Okay.  This is

7         Choka.  I do not have any questions for

8         Mr. Chilton.  Thank you.

9         MR. GERHARDSTEIN:            And, Tom,

10        I assume you're not going to try and ask

11        him questions, right?

12        MR. MADDEN:              Yeah.  As a

13        former Defendant I'm not asking any

14        questions.

15        MR. GERHARDSTEIN:            Right,

16        right.  Okay.  Well, this deposition is

17        therefore concluded.

18            Mr. Chilton, you have a right to read

19        the transcript and offer any corrections

20        that you deem appropriate.  And it will be

21        mailed to your house, or emailed if you

22        have that.

23        THE WITNESS:              I do.

24        MR. GERHARDSTEIN:         We'll work that

25        out off the record.  And I thank you for
```

Page 41

1            your cooperation.

2            THE WITNESS:            Very welcome.

3                        -  -  -

4                (DEPOSITION CONCLUDED.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 42

1   I have read the foregoing transcript from Page 1

2   through 41 and note the following corrections:

3   PAGE     LINE                REQUESTED CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   _____
     DANIEL CHILTON
21       Subscribed and sworn to before me this _____ day

22   of _____, 2020.

23   _____
     Notary Public
24       My commission expires: _____

25

Page 43

1                    CERTIFICATE

2   State of Ohio,      ) SS:

3   County of Cuyahoga.  )

4       I, Kristine M. Esber, a Notary Public within and
    for the State of Ohio, duly commissioned and qualified,
5   do hereby certify that the within-named witness, DANIEL
    CHILTON, was by me first duly sworn to tell the truth,
6   the whole truth and nothing but the truth in the cause
    aforesaid; that the testimony then given by him was
7   reduced to stenotypy, and afterwards transcribed by me
    through the process of computer-aided transcription,
8   and that the foregoing is a true and correct transcript
    of the testimony so given by him as aforesaid.

9

10      I do further certify that this deposition was
    taken at the time and place in the foregoing caption
11  specified.

12      I am not, nor is the court reporting firm with
    which I am affiliated, under a contract as defined in
13  Civil Rule 28(D).

14      I do further certify that I am not a relative,
    employee or attorney of either party, or otherwise
15  interested in the event of this action.

16

17      IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my seal of office at Cleveland, Ohio, on
18  this 11th day of February 2020.

19

20

21      _____
        Kristine M. Esber, Notary Public
22      in and for the State of Ohio.
        My Commission expires November 29, 2020.

23

24

25

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**