# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Debra O'Donnell, *et al.*,                                    Case No. 3:17-cv-02657-JGC

          Plaintiffs

    v.                                                     **ORDER**

G. Michele Yezzo, *et al.*,

          Defendants.

 

    This is a civil rights case under 42 U.S.C. § 1983. It arises from the, since vacated, 1993 conviction of James (Jim) Parsons, who passed away in 2017. Plaintiff, Debra O'Donnell, is Parsons' daughter and administratrix of his estate. She maintains claims on behalf of Parsons' estate against defendant, Michele Yezzo, for fabrication and suppression of evidence in violation of Parsons' constitutional right to due process.[1]

    For the following reasons, I deny Defendant's Motion to Exclude Plaintiff's expert reports, deny Defendant's Motion for Summary Judgment, grant in part and deny in part Plaintiff's Motion for Partial Summary Judgment, and deny Plaintiff's Motion to Strike.

## Factual Background

    On February 12, 1981, Barbara Parsons was beaten to death in the home that she shared with her husband, Jim[2], and their daughters in Norwalk, Ohio.

---

[1] This action originally included state law claims by O'Donnell and James Parsons' other daughter, Sherry Parsons, on behalf of themselves. (Doc. 1, pgID 20-22). The only claims that remain are the ones under § 1983 that O'Donnell brings on behalf of her father's estate. (Doc. 121, pgID 5001-02).

[2] Because Jim Parsons, Barbara Parsons, and Sherry Parsons share a common last name, I refer to all three *infra* by their first names.

Sherry discovered her mother's lifeless body after returning from school that day. (Doc. 88-3, pgID 3818-20). Jim found out while working at his auto repair shop. (Doc. 85, pgID 3418). He complied fully with the Norwalk Police's investigation. He sat for a custodial interrogation. (Doc. 88-4). He admitted having marital problems with his wife but denied any involvement in the murder. (*Id.*, pgID 3829, 3835). He consented to a search of his car, home, and auto shop. (*Id.*, pgID 3846). He turned over his clothes for examination. (*Id.*). No scratches, cuts, or blood were present on his body upon police inspection. (Doc. 88-5).

After examining Barbara's scalp wounds, the coroner stated his opinion that the possible murder weapon was a narrow instrument that was octagonal, triangular, or square-shaped. (Doc. 88-7, pgID 3967-70). The Norwalk Police identified three breaker bars, *i.e.* long metal tools designed to loosen fasteners, as possible murder weapons. One of these was a Craftsman-branded bar that the investigators recovered from Neil Burras, a friend of Mr. Parsons. (Doc. 88-11, pgID 3587). Burras explained how he came to find the Craftsman bar in an affidavit. On January 31, 1981, shortly before Barbara's murder, he purchased a car from Jim. (Doc. 88-12, pgID 3990). A few days after the murder, he cleaned out the car before embarking on a trip to Arizona. (*Id.*). He found no bar. (*Id.*, pgID 3991). Once he arrived in Arizona, he cleaned out the car again and found the bar. (*Id.*). He turned it over to the Norwalk Police. (*Id.*). The FBI analyzed it and found no traces of blood. (Doc. 60-10).

The investigation led to no charges, including against Jim, and the case went cold.

In 1986, Michael White joined the Norwalk Police. (Doc. 82, pgID 1747-48). By 1988, he had joined the department's detective bureau and reopened the investigation into Barbara's unsolved murder. (*Id.*). He reviewed the entire case file and associated evidence, including the Craftsman bar and a bloody bedsheet. (*Id.*, pgID 1748-49). He thought he saw blood imprints of

the Craftsman bar on the bedsheet – one "specific linear mark and then two other diminished marks . . . ." (*Id.*, pgID 1750-51, 1771). He submitted the Craftsman bar and bedsheet to Linda Luke, a scientist with the Cuyahoga County Coroner's Office, for further analysis. (Doc. 85, pgID 2994-95). Luke was unable to match the Craftsman bar conclusively to the bedsheet marks. (*Id.*, pgID 3012). White then submitted the bar to Dr. Henry Lee of the Connecticut State Crime Lab. (Doc. 88-14, pgID 3997). Lee ultimately declined to undertake a full forensic analysis of the evidence. (Doc. 82, pgID 1755-56).

In January 1993, White brought the Craftsman bar, bedsheet, and Barbara's bloody nightgown to defendant Yezzo, a forensic analyst with the Ohio Bureau of Criminal Investigation (B.C.I.). (*Id.*, pgID 1763-64; Doc. 88-16, pgID 4002; Doc. 60-14). Yezzo documented her analysis in two reports – one on February 10, 1993, (Doc. 60-14) and another on May 4, 1993, (Doc. 60-15). She later offered her analysis in testimony to the grand jury and at trial. She concluded:

- Chemical enhancement of the bloody bedsheet, specifically of a "linear impression *deposited in blood*," revealed the letters "S" and "N" matching the letters from the word "CRAFTSMAN" from the Craftsman bar. (Docs. 60-14; 60-15) (emphasis added). The aforementioned letter "N" was visible on the bedsheet prior to chemical enhancement.[3] (Doc. 60-14).

- The nightgown had a "partial impression in blood" that was "consistent in size and shape to the head of the [Craftsman bar]." (Doc. 60-14). Chemical enhancement of bloody "impression" revealed "individualizing characteristics" – specifically an "eye shape" – matching the head area of the side of the breaker bar containing the "CRAFTSMAN" engraving. (Docs. 60-15; 60-24, pgID 662). However, Yezzo testified in her January 2020 deposition that the eye-shaped mark was on the opposite side of the bar. (Docs. 60-34; 116-3, pgID 4752).

- Although Yezzo admitted that she never issued a report on the matter, she testified at trial that she performed a blood spatter experiment. Specifically, she put blood on the breaker bar to see what kind of blood spatter castoff patterns the

---

[3] Notably, White testified in his deposition that he did not observe any letters on the sheet prior to Yezzo's chemical enhancement of it. (Doc. 82, pgID 1770).

bar created when swung. (Doc. 73-4, pgID 1268-71). Her experiment informed her opinion linking Jim and the Craftsman bar to the murder – *i.e.* that the castoff patters come from a narrow instrument swung by a right-handed person. (*Id.*, pgID 1248-51). However, Yezzo testified in her January 2020 deposition that she had not performed the blood spatter experiment. (Doc. 83, pgID 2118).

A jury found Jim guilty of murdering Barbara, and he received a sentence of fifteen years to life. *State of Ohio v. Parsons*, Case No. CR 9300098, at 1 (Huron Common Pleas 2016) (Doc. 78-1, pgID 1557).

In 2015, over two decades later, the Ohio Innocence Project obtained Yezzo's personnel file through a public records request. (*Id.*, pgID 1557). The personnel file revealed concerns about Yezzo's workplace behavior and performance. It detailed "[i]ncidents involving her threats to kill others and herself, engaging in assaultive behavior toward co-workers, and contemptuous behavior toward her superiors . . . ." (*Id.*). A 1989 memo from Daniel Chilton, the assistant superintendent of BCI, concludes that Yezzo's workplace issues "affect[] her overall performance." (Doc. 88-15, pgID 3999). The memo goes on to state that Yezzo's "findings and conclusions regarding evidence may be suspect" and that she "will stretch the truth to satisfy a department." (*Id.*). The memo reflected Chilton's conversations with Ron Dye, Cheryl Siler, Ken Ross, and Dale Laux, FOP 48 union representatives. (*Id.*, pgID 3998). Dye, who has since passed away, worked in the Firearms Section of BCI and shared a lab with Yezzo. (*Id.*; Doc. 88-25, pgID 4209).

Due to her workplace issues, BCI placed Yezzo on administrative leave in June 1993. (Doc. 78-1, pgID 1557). She returned from her leave shortly before testifying in Jim's trial for murder. While Yezzo was on leave, an internal review took place regarding her conduct. Daniel Cappy, BCI's lab director, opined in an interview with internal affairs – which internal affairs documented in a report – that Yezzo had expressed self-doubt to him regarding her performance.

4

Specifically, that her opinions were "always wrong," "she doesn't know what she is doing," and "is no longer capable of performing her duties."[4] (Doc. 88-25, pgID 4235-36).

After these new discoveries from Yezzo's personnel file, Jim petitioned the state court for post-conviction relief and a new trial. His petition stated eight grounds for relief:

(1) Actual innocence;
(2) Failure to produce exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Kyles v. Whitley*, 514 U.S. 419 (1995), and *Giglio v. United States*, 405 U.S. 150 (1972);
(3) Knowing use of misleading and/or false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959);
(4) Junk science;
(5) Shifting science;
(6) Spoilation;
(7) Ineffective assistance of counsel; and
(8) DNA evidence.

(Doc. 114-1, pgID 4457-59).

On April 21, 2016, the court vacated Jim's sentence and granted him a new trial based on his *Brady* claim. (Doc. 78-1, pgID 1558-59). It found "by clear and convincing evidence that Ms. Yezzo's testimony was important and significant in establishing the tool as the murder weapon and ultimately securing a conviction . . . ." (*Id.*, pgID 1558). And the state had suppressed key impeachment evidence from Yezzo's personnel file. In particular, Chilton's conclusions that "the integrity of her analysis and conclusions may be suspect as she 'will stretch the truth to satisfy a department,'" combined with "other evidence of her troubled behavior in the workplace." (*Id.*).

In granting Jim's request for relief, the court found that these revelations "cast grave doubts about [Yezzo's] credibility" and "[u]nquestionably . . . could have been very useful to the

---

[4] Cappy testified in his deposition that he does not recall making the statements that internal affairs documented from his interview. (Doc. 88-25, pgID 4236). That said, he admitted that he has no reason to doubt the veracity of the internal affairs report and that Yezzo would make self-deprecating comments like the ones in the report "from time to time." (*Id.*, pgID 4235-36).

5

defense in its cross-examination . . . ." (*Id.*). The verdict was therefore "unworthy of confidence." (*Id.*, pgID 1559). The court further stated that Yezzo's analysis was "perhaps . . . the difference-maker, that convinced law enforcement to finally charge" Jim. (*Id.*). The court did note that its grant of a new trial was "not a declaration of the Defendant's innocence." (*Id.*). It also dismissed Jim's seven other grounds for relief. (*Id.*).

On April 25, 2016, almost twenty-three years after his incarceration, the state released Jim, pending a new trial. (*Id.*). On February 8, 2017, Jim passed away, and the state court subsequently entered a judgment closing the criminal case. (Doc. 121-2, pgID 5069).

**Plaintiff's Expert Reports**

In support of the claims against the Defendant, Plaintiff has submitted three expert reports. Defendant has moved to exclude these reports as inadmissible under the standards set forth in Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (Doc. 115).

Two of these expert reports analyze and critique Yezzo's forensic analysis and related testimony connecting the Craftsman bar to Barbara's murder. Stuart H. James authored one of these reports ("James Report"). (Doc. 118-1). James owns a forensic consulting firm and has decades of experience as a forensic analyst, including, since 1993, specifically in the field of bloodstain pattern analysis. (*Id.*, pgID 4869). He has taught numerous courses in bloodstain pattern analysis. (*Id.*, pgID 4898-903). He has also consulted and testified many times regarding the same. (*Id.*, pgID 4920-22).

James reviewed, among other things, physical evidence from the crime scene, Yezzo's two reports, and her ensuing testimony in the criminal trial. (Doc. 118-1, pgID 4869-72). He also performed an experiment to test Yezzo's conclusions. Specifically whether "the letters on the

handle of the CRAFTSMAN [breaker] bar and if the head of the [breaker] bar can be reproduced . . . ." (*Id.*, pgID 4882). For the experiment, he placed his own blood containing an anticoagulant on a test Craftsman breaker[5] bar ("test bar"). (*Id.*, pgID 4880).

The test bar, which also contained the word "CRAFTSMAN" engraved into the handle, had at least some different dimensions than the one Yezzo analyzed. The test bar was a couple inches longer than the Craftsman bar. (*Id.*, pgID 4877, 4881). While the James Report includes a picture of the test bar, it does not give its other dimensions aside from its length– e.g. weight, width, and depth of the recessed "CRAFTSMAN" letters. (*Id.*, pgID 4881). Thus, it is not entirely clear how else the test bar and the Craftsman bar were specifically different.

James made multiple strikes with the test bar on a pillowcase that was over a firm pillow. (*Id.*, pgID 4880-82). The pillowcase was a 60/40 cotton-polyester blend – different from the 50/50 blend of the bloody bedsheet at the crime. (*Id.*, pgID 4872-73, 4880).

James then sent the pillowcase containing the blood impressions from the test breaker bar to Anna Cox for chemical enhancement. (*Id.*, pgID 4882). Cox, like James, owns a forensic consulting firm and is a forensic scientist specializing in bloodstain pattern analysis. (*Id.*, pgID 4926). She has consulted and taught courses regarding bloodstain pattern analysis since 2013. (*Id.*, pgID 4926-29). She has performed bloodstain pattern analysis in over 180 cases and has testified as an expert regarding the same in at least one of those cases. (*Id.*, pgID 4926-27).

Cox used diaminobenzidine ("DBA") to enhance the blood transfer patterns on the pillowcase. (*Id.*, pgID 4924). Yezzo used a different chemical enhancing agent, o-tolidine, on the bloodstained fabrics from the crime scenes. (Doc. 83, pgID 2039). Cox took photographs of the blood patterns immediately after applying the chemical enhancer and after it had dried. (Doc.

---

[5] The James Report refers to a "flex bar," which is the same thing as a breaker bar.

118-1, pgID 4924). In a report ("Cox Report"), she noted that, on various areas of the pillow

case, "some of the letters of the word "Craftsman" became more defined." (*Id.*, pgID 4924-25).

She returned the pillowcase to James for further analysis. (*Id.*, pgID 4925).

According to the James Report, the experiment yielded "[m]irror images of the letters of

Craftsman" on the pillowcase, and they "appeared as *voided areas* within the stain pattern." (*Id.*,

pgID 4882) (emphasis added). This result "was consistent with the fact that the letters were

impressed and not raised on the handle." (*Id.*). The letters became clearer after chemical

enhancement. (*Id.*). The pillowcase also indicated "[r]ecognizable impressions of the head of the

[breaker] bar," which also became clearer after chemical enhancement. (*Id.*).

Based on his review of the physical evidence, Yezzo's reports and testimony, and the

results of the experiment, James concludes:

- Yezzo's assessment that the bedsheet revealed the letter "S" following chemical enhancement "was well beyond what a reasonable forensic examiner would opine based on the evidence." (*Id.*, pgID 4885-86). An "S" was not visible on the bedsheet. (*Id.*). While Yezzo concluded that an "S" was present following chemical enhancement, she did not photograph the sheet during or immediately after the chemical enhancement process. This, per James, was "unacceptable forensic practice," and, at the time of Yezzo's examination, "a reasonable forensic scientist analyzing bloodstains would not render [the opinion regarding the presence of the letter 'S'] that was not supported by lab notes and or photography or witnessed by a colleague." (*Id.*).

- Her assessment that the bedsheet contained linear impressions of the letter "N" matching the Craftsman bar likewise was "well beyond what any reasonable examiner would find from the evidence in this case." (*Id.*, pgID 4886-87). Although Yezzo concluded otherwise, the presence of the letter "N" was not verifiable from her photographs of the bedsheet. (*Id.*). James' experiment did not recreate "any linear impression *deposited in blood*" resembling the "N" from the Craftsman bar. (*Id.*) (emphasis added). Rather, the experiment revealed the "opposite" – *i.e.* "a void or unstained area matching the letter 'N.'" (*Id.*). The James Report criticizes Yezzo's failure to sufficiently document her findings; also, for failing to receive a second opinion. (*Id.*).

- Her conclusion that the bloodstains on Barbara's nightgown presented an "eye shape," "individualizing mark" matching the head of the Craftsman bar was "well

8

beyond any opinion that a reasonable forensic examiner would find based on the evidence." (*Id.*, pgID 4888). Yezzo noted in her reports and later testified at trial that the "eye shape" appeared on the side of the Craftsman bar containing the "CRAFTSMAN" engraving. (*Id.*). But, as she acknowledged in a declaration, she identified the "eye shape" on the opposite side of the bar during her deposition for this case. (Docs. 60-34; 116-3, pgID 4752). James did not identify the eye shape during his independent visual examination of the nightgown, including under magnification. (Doc. 118-1, pgID 4888). The James Report again criticizes Yezzo for failure to document her findings or receive a second opinion. (*Id.*).

- Her trial testimony drawing inferences from the blood cast-off stains on the wall of the crime scene was likewise "well beyond [what] a reasonable forensic examiner would find based on the evidence . . . ." (*Id.*). Specifically, her conclusions that the stains came from a narrow instrument that a right-handed individual wielded. (*Id.*). Per the James Report, how someone may have held a weapon at a particular time is not a basis to determine whether someone is always right-handed. (*Id.*). Additionally, Yezzo testified at trial that she performed an experiment with the Craftsman bar in evidence to replicate the transfer stains at the crime scene. She placed blood on it and created transfer patterns on sheeting material. (*Id.*). But she later stated in her deposition for this case that she had not performed the experiment. (*Id.*, pgID 4889; Doc. 83, pgID 2118). James also opines that Yezzo's use of the actual Craftsman bar in evidence to perform her alleged experiment "has always been considered unacceptable forensic practice before 1993." (Doc. 118-1, pgID 4889). As James had done for his experiment with the test bar, "[t]he proper forensic technique would be to use a similar flex bar, not an evidentiary item." (*Id.*).

Cox and a second forensic scientist, L. Allyn DiMeo, conducted a peer review of the James Report. (*Id.*).

The last expert report that the Defendant moves to exclude is from Dr. Donna Mayerson ("Mayerson Report"). (Doc. 115-4). Dr. Mayerson holds a Ph.D. in counseling psychology and, since 1997, holds a practicing license in Ohio. (*Id.*, pgID 4647). She bases her opinions on a literature review of relevant peer-reviewed studies, her own experience counseling exonerated individuals, and evidence specific to Jim – *i.e.* his "medical records, case notes, requests . . . for medical care, letters to his family," and "observations" from those who interacted with him. (*Id.*, pgID 4643-45).

The Mayerson Report discusses the severe psychological impacts and suffering that the "wrongfully convicted" face generally – and Jim in particular – because of incarceration. (*Id.*, pgID 4643-45). It discusses the unique "feelings of shame and guilt" and "fatigue" that set in for those "continually claiming innocence." (*Id.*, pgID 4644). The report concludes that "the stress and the conditions of his incarceration absolutely contributed to the number and severity of Jim's health conditions." (*Id.*, pgID 4645).

### Procedural History

On December 20, 2017, Plaintiff Debra O'Donnell filed this suit against several Defendants, including Yezzo, as administratrix of her father's estate. In addition to the constitutional claims O'Donnell brought on behalf of her father's estate, O'Donnell and Sherry Parsons brought state law claims on behalf of themselves. I dismissed some of Plaintiffs' claims and granted summary judgment on the others. (Docs. 31; 93). Relevant now is my dismissal of the *Brady* and fabrication-of-evidence claims under § 1983 against Yezzo. (Doc. 31).

Plaintiffs appealed my orders. The Sixth Circuit reversed and remanded my dismissal of the *Brady* and fabrication-of-evidence claims against Yezzo. *O'Donnell v. Yezzo*, No. 21-3396, 2022 WL 130885, at *6 (6th Cir. Jan. 14, 2022). I now address the four Motions, identified *supra*, which arise from the claims remaining against Yezzo on remand.

### Admissibility of Expert Reports Under *Daubert*

Before proceeding with my rulings on the parties' cross-Motions for Summary Judgment, I will determine the admissibility of the James, Cox, and Mayerson Reports – two of which are relevant to those cross-Motions. All three expert reports are admissible, and I deny Defendant's Motion to Exclude them.

Under Federal Rule of Evidence 702, I perform a "gatekeeping role" to ensure "that an expert's testimony both rests on a reliable foundation and is relevant . . . ." *Daubert, supra*, 509 U.S. at 597. Rule 702 applies to all "scientific, technical, or other specialized" expert testimony. *See generally Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 149 (1999). Expert testimony must satisfy three requirements to be admissible:

> First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable.

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702) (citations omitted).

Another way to think of relevance is whether there is a "fit" between the expert testimony and an issue for trial. *Daubert, supra*, 509 U.S. at 591.

The Supreme Court has in *Daubert* provides a list of non-exclusive factors for considering the reliability of an expert opinion. They include "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *In Scrap Metal Antitrust Litig., supra*, 527 F.3d at 529 (citing *Daubert, supra*, 509 U.S. at 593-94). "[T]he test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd., supra*, 526 U.S. at 141 (internal quotations omitted). I have "broad latitude" in "*how* to determine reliability . . . ." *Id.* at 142. My ultimate task is to separate "reliable opinions from 'junk science.'" *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 182 (6th Cir. 2009).

"[R]ejection of expert testimony is the exception, rather than the rule." *In Scrap Metal Antitrust Litig., supra*, 527 F.3d at 530 (quoting Fed. R. Evid. 702 Advisory Committee's Note,

2000 Amend.). As I have previously observed, "[m]y role as gatekeeper is not intended to serve as a replacement for the adversary system." *MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 781 (N.D. Ohio 2013) (internal quotations and citation omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (internal quotations and citation omitted).

### 1. The James and Cox Reports

Defendant does not dispute that James and Cox are qualified, and I find that they are. She argues that "their methods were faulty," *i.e.* unreliable. (Doc. 115, pgID 4553). Specifically, that their experiment fails "to replicate the conditions under which the blood transfer impressions Defendant analyzed were created." (Doc. 115, pgID 4555). Therefore, she claims, any testimony regarding the experiment is irrelevant, as it "cannot fit the facts of the case."[6] (*Id.*).

Yezzo contends that James' experiment is unreliable and does not adequately replicate the conditions under which the blood transfers were created for a bevy of reasons: the test bar had different dimensions than the Craftsman bar, and it is unknown whether the "CRAFTSMAN" engraving on both bars were similar in depth; the blood James placed on the

---

[6] Defendant also argues for exclusion of the James and Cox Reports because they do not include "a statement of the compensation to be paid for" the expert opinions under Fed. R. Civ. P. 26(a)(2)(B)(vi). (Doc. 115, pgID 4553). The first-filed versions of the Reports reference the attachment of but do not actually include a fee schedule. (Doc. 115-1, pgID 4561). Plaintiff attached to its opposition to Defendant's Motion to Exclude (Doc. 118) a copy of the James Report, this time with a statement of compensation for both James and Cox (Cox's compensation was pursuant to her assistance with chemical enhancement of blood stains in preparation of the James Report). (Doc. 118-1, pgID 4868). Plaintiff explains the initial failure to provide a compensation statement as an inadvertent mistake. (Doc. 118, pgID 4857). Under these circumstances, I do not find Plaintiff's initial omission of a compensation statement to be a basis for excluding the reports. *See Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 783 (6th Cir. 2003) (finding that an "honest mistake" to disclose an expert report compensation statement did not require exclusion of testimony).

test bar contained an anticoagulant, which was not present in Barbara's blood and makes blood less sticky; James did not specify the temperature of the blood when he placed it on the test bar, and blood becomes less sticky when it is colder; the pillowcase fabric was a different blend than the bedsheet from the crime scene; the firm pillow did not match the density of either the mattress or Barbara's skull and jaw; James transferred blood directly onto the test bar, while Barbara's blood was transferred indirectly onto the Craftsman bar when she was being beaten; Cox used a different chemical agent than Yezzo to enhance the bloodstains; and James created bloodstains on the pillowcase only through randomly beating it, instead of resting the test bar on it to see how the fabric absorbed the blood impressions. (*Id.*, pgID 4553-54).

Yezzo characterizes the James and Cox Reports as both unreliable and irrelevant. The gravamen of her challenge is that James' and Cox's experiment does not sufficiently replicate or "fit" the conditions under which the bloodstains found at the crime scene came to exist (Doc. 115, pgID 4555). It is primarily in this context that Yezzo criticizes the experiment's "faulty" method. (*Id.*, pgID 4553).

To the extent Yezzo calls the reliability or inherent "trustworthiness," *see Daubert, supra*, 509 U.S. 590 n.9, of the test experiment into question, I find her arguments unavailing. James predicates his conclusions, in part, on his visual evaluation of the crime scene evidence, and visual inspection is a reliable basis for a qualified expert to form an opinion. *See Mohney v. USA Hockey, Inc.*, 300 F. Supp. 2d 556, 566 (N.D. Ohio 2004) (finding that "visual inspection," "which can be verified and critiqued" is a "reliable basis" for an expert opinion) (Katz, J.), *aff'd*, 138 F. App'x 804 (6th Cir. 2005); *see also Davis Elecs. Co. v. Springer Cap., LLC*, 558 F. Supp. 3d 443, 449 (W.D. Ky. 2021) (collecting Sixth Circuit cases to explain that "expert testimony can be reliable without the expert performing tests to support his or her theory"); *Jacobs v.*

13

*Tricam Indus., Inc.*, 816 F. Supp. 2d 487, 493 (E.D. Mich. 2011) (explaining that "testing is not required in every case, particularly where, as here, the expert conducted an examination of the physical evidence").

Furthermore, under the flexible *Daubert* analysis, James' test experiment is a reliable basis for his expert opinion.

The James Report, including its description of the test experiment, was subject to peer review by two forensic scientists. This *Daubert* factor therefore weighs in favor of reliability.

The experiment, as the James Report describes it, is testable. To be sure, and as Defendant points out, the James Report's write-up of the experiment lacks certain details – *e.g.* the temperature of the blood when applied to the test bar and the precise dimensions, aside from length, of the test bar, including the depth of the recessed letters on the handlebar – that prevent exact replication of James' method. But the significance of those issues is an issue of fact best left to the adversarial system post-admission. *See In re Flint Water Cases*, No. 17-10164, 2021 WL 5356295, at *3 (E.D. Mich. Nov. 17, 2021) (finding bone density measurements, which an expert made with a medical device without specifying the precise configuration of the device, to be nonetheless testable and reliable); *see also Stephenson v. Fam. Sols. of Ohio, Inc.*, No. 1:18CV2017, 2022 WL 17647282, at *11 (N.D. Ohio Dec. 9, 2022) (finding that expert damage calculations, which failed "to consider certain factual information" were reliable and that the factual deficiencies went to the "weight of the evidence rather than . . . admissibility").

Finally, Yezzo argues that "there is simply too great an analytical gap" between the test experiment results and James' opinion that Defendant's conclusions were outside "the range of opinions that a reasonable forensic examiner would find." (Doc. 120, pgID 4984; Doc. 118-1, pgID 4869).

14

In support this last contention, Yezzo submits an expert report by Dr. John D. Schupp and Dr. Sushmita Ghosh, professors of chemistry/forensic science and biology, respectively, at Tiffin University ("Schupp/Ghosh Report"). (Doc. 115-3). The Schupp/Ghosh Report details their own test experiment performed with the actual Craftsman bar in evidence. Schupp and Ghosh conclude that their experiment yielded "letters imprinted in blood," which were "consistent with" Yezzo's findings. (*Id.*, pgID 4641). They also criticize the methodology underlying James' test experiment – *e.g.* his method of randomly striking the pillowcase rather than placing it there for an extended time and his use of blood containing an anticoagulant. (*Id.*, pgID 4626-31).

Here too, I disagree with the Defendant. James, who I have determined to be qualified to opine on blood pattern analysis, bases his opinions on independent examination of the same evidence that Yezzo examined, review of Yezzo's work product and testimony, and the test experiment. These three legs of the stool support James' opinion regarding the reasonableness of Yezzo's conclusions. Yezzo attacks only one leg, the test experiment.

That Schupp and Ghosh came to a different conclusion regarding the reasonableness of Yezzo's findings does not render James' opinions unreliable. Indeed, a touchstone principle from *Daubert* is that my determination of reliability "must be solely on principles and methodology, *not on the conclusions they generate.*" *Supra*, 509 U.S. at 595 (emphasis added).

Suffice it to say, James' test experiment supports the contention that a breaker bar with recessed "Craftsman" lettering would not create "letters imprinted with blood" and, in fact, would produce the opposite. *See Babcock Power, Inc. v. Kapsalis*, 854 F. App'x 1, 8 (6th Cir. 2021) ("[A]s long as there is a reasonable factual basis for the expert's opinion, any objections to his testimony go to its weight and not its admissibility.").

Defendant is free to vigorously contest the James Report vis-à-vis the alleged deficiencies of the test experiment, but the latter does not preclude admission of the former. Coupled with James' review of the crime scene evidence and Yezzo's work product, there is a reasonable basis to find reliable his opinion regarding the acceptability of Yezzo's conclusions.

In sum, adopting the language of another Court, "[t]here is simply no indication that Plaintiff[] is attempting to introduce 'junk science' masquerading as expert analysis." *Davis Elecs. Co. supra*, 558 F. Supp. 3d at 449.

The James and Cox Reports are also relevant – specifically to Plaintiff's fabrication-of-evidence claim. Defendant emphasizes that the conditions and method underlying the James test experiment do not "fit" the facts of the case.

I have already addressed *supra* why I find James' opinions reliable on the issue of whether Yezzo's conclusions were "well beyond what a reasonable forensic examiner would find based on the evidence," (Doc. 118-1, pgID 4886-88), including to the extent they rely on the outcome of his test experiment.

James' opinion ultimately goes to the standard of care Yezzo, as a forensic examiner in 1993 when she made her reports, allegedly was "well beyond." "Courts have generally permitted expert testimony regarding standards of care in situations where the testimony is distinctively related to a profession beyond the understanding of the average layman." *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 698, 710 (S.D. Ohio 2016) (internal quotations omitted).

This is one such case. The professional standards set for a forensic examiner in 1993 are beyond the understanding of an average layman. The Sixth Circuit has made clear that an expert's opinion that a forensic examiner's conclusions are "far afield of what any reasonable

16

forensic examiner would find from the evidence" can create a reasonable inference of fabrication. *Gregory v. City of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006). That is exactly what the James Report does. It is therefore relevant.

Because the James and Cox reports are both reliable and relevant, I deny Defendant's Motion to Exclude them.

### 2. The Mayerson Report

Defendant does not dispute Dr. Mayerson's qualifications or the reliability of her opinions. Instead, she contests the Mayerson Report's relevance because it opines on the psychological impacts and suffering faced by the "wrongfully convicted." Yezzo's definition of a "wrongful conviction" is one in which the convicted is later successful in establishing actual innocence. (Doc. 115, pgID 4557). This, says Yezzo, is a fatal flaw to the Mayerson Report's claim to relevance. Indeed, the state court made clear when it vacated Jim's conviction that it was not making an affirmative finding of innocence.

Yezzo cites no authority to support her definition of "wrongful conviction" as requiring a finding of innocence. Scholars often categorize wrongful convictions as those involving either factually innocent defendants or procedural injustices. *See, e.g.*, Carrie Leonetti, *The Innocence Checklist*, 58 AM. CRIM. L. REV. 97, 107-08 (2021); D. Michael Risinger, *Innocents Convicted: An Empirically Justified Factual Wrongful Conviction Rate*, 97 J. CRIM. L. & CRIMINOLOGY 761, 804 n.2 (2007). Plaintiff claims wrongful conviction under the latter category.

The Mayerson Report does not precisely define the wrongfully convicted. At separate points, it refers to the psychological impact of imprisonment on "exonerees" and people "continually claiming innocence." (Doc. 115-4, pgID 4644). Jim always maintained his innocence but was never fully exonerated, as a new trial was set prior to his death. The Mayerson

Report lacks definitional precision, but it does indicate some applicability to Jim's experience, as Plaintiff alleges – his incarceration resulting from violations of his constitutional rights. It helps assist the trier of fact understand the degree of damages Jim might have suffered.[7]

Actual innocence is not an element of Plaintiff's claims, and nothing in the law clearly requires such showing for a conviction to be "wrongful." The Mayerson Report is therefore relevant. Because the Mayerson Report is admissible, I deny Defendant's Motion to Exclude it.

The rest of Defendant's briefing on her Motion to Exclude the Mayerson Report is really an argument in favor of her Motion for Summary Judgment. Specifically, she argues against the accrual of Plaintiff's claims under *Heck v. Humphrey*, 512 U.S. 477 (1994). For reasons I explain more fully *infra* in my discussion of the parties' cross-Motions for Summary Judgment, I disagree.

### Summary Judgment Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant initially must show the absence of a genuine issue of material fact. *Id.* at 323. "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008) (quoting *Celotex*, *supra*, 477 U.S. at 325).

---

[7] Because damages are not a required element for Plaintiff's claims, my decision on the admissibility of the Mayerson Report has no bearing on my decisions on the cross-Motions for Summary Judgment. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) (holding that "the denial of procedural due process should be actionable for nominal damages without proof of actual injury").

Once the movant carries its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I should grant summary judgment where "in light of the evidence viewed in the light most favorable to the [nonmoving party], no reasonable juror could fail to return a verdict for the [movant]." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014).

## Discussion

Plaintiff alleges that Defendant intentionally fabricated the results of her blood pattern analysis connecting the Craftsman bar to the crime scene. (Doc. 121, pgID 5019).

Plaintiff further alleges that Defendant violated *Brady* by failing to disclose to the prosecutor that she had fabricated her forensic reports, her opinions were always wrong, and she was incapable of performing her duties. (*Id.*, pgID 5032).

Plaintiff moves for partial summary judgment on the theory that the state court already decided certain elements of the § 1983 claims in favor of Plaintiff when granting Jim's post-conviction relief. Plaintiff argues that the doctrine of collateral estoppel bars relitigation of those issues that were already decided.

Defendant also moves for summary judgment – arguing under several theories that the record presents no genuine issue of material fact for trial. I address *infra* the arguments raised in support of both Motions.

## 1. Favorable Termination

Yezzo argues as a threshold matter that the Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Plaintiff's civil action.

*Heck* holds that a § 1983 action for a procedurally "unconstitutional conviction or imprisonment" requires a plaintiff to prove: "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, *declared invalid by a state tribunal authorized to make such determination*, or called into question by a federal court's issuance of a writ of habeas corpus . . . ." *Supra* 512 U.S. at 486-87 (emphasis added). These conditions constitute "favorable termination" of a prosecution. *McDonough v. Smith*, 139 S. Ct. 2149, 2156 (2019).

*Heck* therefore recognizes a favorable termination requirement for claims relating to imprisonment arising from constitutionally infirm process. *Supra*, 512 U.S. at 484. The requirement applies to both fabrication-of-evidence, *McDonough, supra*, 139 S. Ct. at 2156, and *Brady* claims, *Jordan v. Blount Cnty.*, 885 F.3d 413, 415 (6th Cir. 2018). This is because favorable termination is an element of the closest common-law analogous cause of action, malicious prosecution. *Heck, supra*, 512 U.S. at 484.

The requirement has its roots "in pragmatic concerns." *McDonough, supra*, 139 S. Ct. at 2151. As the Court explained in *Heck*:

> This requirement avoids parallel litigation over the issues of probable cause and guilt ... and it precludes the possibility of the claimant [sic] succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction. Furthermore, to permit a convicted criminal defendant to proceed with a malicious prosecution claim would permit a collateral attack on the conviction through the vehicle of a civil suit. This Court has long expressed similar concerns for finality and consistency and has generally declined to expand opportunities for collateral attack.

20

*Supra*, 512 U.S. at 484-85 (internal quotations and citations omitted). In Yezzo's view, a favorable termination only occurs when a criminal defendant proves actual innocence or a conviction becomes improbable. Only then would that defendant be able to bring a civil § 1983 action without implicating the pragmatic concerns of *Heck.* (Doc. 116, pgID 4656).

Yezzo misconstrues the favorable termination requirement. The Supreme Court has recently clarified that favorable termination for a § 1983 malicious prosecution claim under the Fourth Amendment "does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence." *Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022). Instead, a plaintiff "need only show that the criminal prosecution ended without a conviction." *Id.*

Yezzo argues that *Thompson* narrowly applies to Fourth Amendment § 1983 malicious prosecution claims, and favorable termination still requires an affirmative indication of innocence under Plaintiff's due process claims. (Doc. 124, pgID 5108). I disagree. The Supreme Court's interpretation of favorable termination in *Thompson* applies equally in this case, and Plaintiff's action implicates none of the *Heck* pragmatic concerns.

When determining the elements of a § 1983 claim, courts are "to first look to the elements of the most analogous tort as of 1871 when § 1983 was enacted, so long as doing so is consistent with the values and purposes of the constitutional right at issue." *Thompson, supra*, 142, S. Ct. at 1337 (internal quotations and citations omitted).  The common-law tort of malicious prosecution is most analogous to a Fourth Amendment malicious prosecution claim. *Id.* The same common-law tort is also analogous to fabrication-of-evidence and *Brady* claims under the Fourteenth Amendment. *McDonough, supra*, 139 S. Ct. at 2155 (fabrication-of-evidence); *Jordan, supra*, 885 F.3d at 415 (*Brady*).

21

In *Thompson*, the Supreme Court determined that, in 1871, "the favorable termination element of a [common-law] malicious prosecution claim was satisfied so long as the prosecution ended without a conviction." *Supra*, 142, S. Ct. at 1338. The Fourth Amendment claim from *Thompson* and the Fourteenth Amendment claims in this case share malicious prosecution as the relevant tort analog from 1871. The tort analog is the source of the favorable termination requirement. *Thompson*'s conception of "favorable termination" therefore applies equally to Plaintiff's fabrication and *Brady* claims.

Yezzo offers no convincing justification for defining the favorable termination requirement differently for Fourth and Fourteenth Amendment § 1983 claims. Plaintiff's claims implicate none of the pragmatic concerns from *Heck*. The state court vacated Jim's conviction and closed his case entirely when he died. The risk of harms associated with dueling civil and criminal proceedings passed with Jim and the ensuing closure of his case. There will be no parallel litigation; no conflicting resolutions regarding his guilt; no collateral attack on a valid conviction. Jim died presumed innocent. His vacated conviction holds no weight. There is no outstanding criminal judgment. Finding favorable termination under these circumstances is entirely consistent with the rationales of *Heck* and *Thompson*.[8] *See also Carr v. Louisville-Jefferson Cnty.*, 37 F.4th 389, 391, 395 (6th Cir. 2022) (holding that a governor's full pardon, "regardless of its implications for the question of innocence, meets the requirements of *Heck*" and constitutes favorable termination for purposes of the plaintiff's fabrication and *Brady* claims), *cert. denied*, 143 S. Ct. 640 (2023).

---

[8] Yezzo also argues that Plaintiff is barred under the doctrine of *res judicata* from litigating Jim's actual innocence because the state court denied that ground for post-conviction relief. (Doc. 116, pgID 4659-60). Because the favorable termination requirement does not require an affirmative indicator of innocence, Yezzo's *res judicata* argument contains nothing of significance, even if I accept it as true. Therefore, I decline to address it.

The cases Yezzo cites to the contrary are unavailing. She suggests that favorable termination for a fabrication-of-evidence claim requires an acquittal under *McDonough, supra*, 139 S. Ct. at 2158 n.7. The plaintiff in *McDonough* alleged that the defendant fabricated evidence in a criminal prosecution against him for forged absentee ballots. *Id.* at 2154. The first criminal trial against him ended in a mistrial; a second trial ended with his acquittal. *Id.* The Supreme Court reasoned that, under those circumstances, the § 1983 plaintiff achieved favorable termination only upon his acquittal. *Id.* at 2158 n.7. Acquittal was sufficient – not necessary – to satisfy the favorable termination requirement. *McDonough* did not foreclose other avenues to favorable termination.

Yezzo also cites language from *Jones v. Clark County*, 959 F.3d 748, 765 (6th Cir. 2020), to support her interpretation of the favorable termination element. But *Thompson* expressly abrogates *Clark County. Supra*, 142 S. Ct. at 1340.

She also incorrectly relies on *McIlwain v. Dodd*, No. 22-5219, 2022 WL 17169006 (6th Cir. Nov. 22, 2022) to argue that *Thompson* does not apply beyond § 1983 claims under the Fourth Amendment. That case involved a state tort claim for malicious prosecution against private individuals – not a § 1983 action against government officials. *Id.* at *6. The plaintiff was arguing that the definition of "favorable termination" from *Thompson* should apply to the state tort claim, and the Sixth Circuit disagreed due to the differences between the two causes of action. *Id.* At no point did the Sixth Circuit say, let alone articulate any reason why, the favorable termination definition from *Thompson* would apply only to Fourth Amendment § 1983 claims and not others. This omission is unsurprising. The Supreme Court's analysis in *Thompson* starts from the principle that the definition of "favorable termination" for § 1983 actions became set in stone upon passage of § 1983 in 1871. The fact that favorable termination as an element of the

23

state tort of malicious prosecution continues to evolve through the common law has no bearing

on its application to a § 1983 action.

A lack of favorable termination therefore does not entitle Defendant to judgment as a

matter of law and is not a reason to grant summary judgment in her favor.

## 2.  Fabrication Claim

Defendant moves for full summary judgment, and Plaintiff moves for partial summary

judgment on Plaintiff's fabrication-of-evidence claim.

A fabrication claim has two elements: (1) the defendant "knowingly fabricated evidence

against" a plaintiff; and (2) "there is a reasonable likelihood that the false evidence could have

affected the judgment of the jury." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir.

1997). While absolute immunity extends to testimony in an adversarial judicial proceeding, pre-

trial investigatory acts do not merit such protection. *Gregory v. City of Louisville*, 444 F.3d 725,

738-40 (6th Cir. 2006). The Sixth Circuit "sees no reason to treat the intentional fabrication of a

forensic report differently from the intentional fabrication of a police officer or prosecutor." *Id.*

### A.  Knowing Fabrication

According to Defendant, Plaintiff has failed to set forth specific facts showing that there

is a genuine issue for trial regarding the element of knowing fabrication. I disagree.

An expert report stating that a forensic examiner's findings "are far afield of what any

reasonable forensic examiner would find from the evidence" constitutes "sufficient evidence

from which a jury might reasonably infer" knowing fabrication. *See Gregory, supra*, 444 F.3d at

744-45.

*Gregory* is instructive. The plaintiff in that case had been convicted of rape, attempted

rape, and burglary. *Id.* at 731. One of the defendants was a forensic examiner at the Kentucky

State Police Crime Laboratory. *Id.* at 732. The perpetrator of the crime had left at the crime scene a pantyhose he had worn as a mask. The pantyhose mask contained seven hairs, but the examiner only noted the existence of five hairs in her forensic report. *Id.* at 744. She determined that these five hairs matched the plaintiff's hair but neglected to mention the two hairs, which the plaintiff argued were dissimilar. *Id.* at 732.

Approximately seven years after the plaintiff's conviction, DNA testing of the hairs found in the pantyhose mask exonerated him. *Id.* at 735. The plaintiff then brought several § 1983 claims against various state officials involved in his prosecution. His claims included one for fabrication-of-evidence against the forensic examiner. In support of his claim, he submitted an expert report determining that the forensic examiner's findings – that there were only five hairs on the pantyhose and all of them matched the plaintiff's hair – were "far afield of what any reasonable forensic examiner would find from the evidence." *Id.* at 744.

The Sixth Circuit held that a jury may reasonably infer from the expert report that the defendant's actions constituted knowing fabrication. *Id.* In doing so, it determined that the plaintiff's expert opinion, finding that the defendant had operated well outside the acceptable standards of her profession, were "proper." *Id.* at 745 n.9. The defendant argued that her performance was, at most, negligent and that a jury could not infer knowing fabrication from such negligence. *Id.* at 744-45. But the Sixth Circuit observed that her argument raised only a disputed issue of material fact and affirmed the district court's denial of the defendant's motion for summary judgment. *Id.*

The James Report, which I find admissible, states that Yezzo's conclusions from her two forensic reports were "well beyond" what a reasonable forensic examiner would determine based on the evidence. The essential findings supporting the James Report's determination are twofold.

First, that the engraved, recessed letters on the handle of the Craftsman bar would produce, if anything, "voided" areas matching those letters surrounded by blood rather than impressions of those letters "deposited in blood."[9]

Second, that the "individualizing mark" at the head of the Craftsman bar was not verifiable from bloodstains at the crime scene, and Yezzo's findings to the contrary are highly questionable due to her inconsistent deposition statement regarding the location of the mark.[10]

These are compelling reasons supporting the James Report's ultimate conclusion that the Defendant's conduct fell "well beyond" the standards of her profession. Therefore, the James Report, like the expert report was in *Gregory*, creates a genuine issue for a jury regarding Yezzo's alleged knowing fabrication.

Yezzo's arguments to the contrary, including her criticism of the methodology James employed in his test experiment and her proffer of the Schupp/Ghosh Report refuting the James

---

[9] In fact, in reversing my earlier judgment granting Yezzo's motion to dismiss the fabrication claim, the Sixth Circuit found that it could draw a "reasonable logical inference" of knowing fabrication because the recessed letters would have appeared "as white spots in a stain of blood, rather than as bloodstains themselves." *O'Donnell v. Yezzo*, No. 21-3396, 2022 WL 130885, at *6 (6th Cir. Jan. 14, 2022). The James Report constitutes admissible evidence substantiating this inference.

[10] The James Report also criticizes Yezzo for testifying in trial that she performed an experiment creating blood cast-off stains with the Craftsman bar – to verify her finding that a right-handed wielder of a narrow instrument created the cast-off stains at the crime scene – but later denying in her deposition that she had done so. Since she did not document this experiment in her pre-testimonial forensic reports, and Plaintiff has made no allegation regarding the effect of her purported findings on the State's decision to charge and prosecute Jim, I do not factor this issue at all in my analysis of the knowing fabrication element of Plaintiff's claim. This is because Yezzo's trial testimony contains the only statements regarding the purported experiment in the record, and she is absolutely immune for her testimonial acts. *See Briscoe v. LaHue*, 460 U.S. 325, 345 (1983).

Report, indicate a genuine dispute of fact for trial. They do not warrant judgment as a matter of law in her favor.[11]

## B.  Reasonable Likelihood of Affecting the Jury

In support of her Motion for Partial Summary Judgment, Plaintiff argues that the state court already decided the second element of the fabrication claim – whether the fabricated evidence had a reasonable likelihood of affecting the jury – in Plaintiff's favor. And that issue preclusion, *i.e.* collateral estoppel, bars Defendant from relitigating that element. I agree. But, even if Plaintiff is not entitled to issue preclusion, there is a genuine factual issue for trial that forecloses my grant of Defendant's own Motion for Summary Judgment on the element.

### i.  Issue Preclusion

I apply Ohio law when determining the applicability of issue or claim preclusion to an Ohio state court judgment. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see also* 28 U.S.C. § 1738.

Issue and claim preclusion "protect the finality of . . . judgments and prevent parties from relitigating the same disagreement in perpetuity." *See CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 490 (6th Cir. 2021).

---

[11] Defendant also argues that the statement from the 1989 Chilton Memo that Yezzo "will stretch the truth to satisfy a department" does not support a finding of knowing fabrication. This is so, she argues, because the comment from the memo is inadmissible. (Doc. 116, pgID 4667). Chilton produced his memo following a conversation with, among others, Ron Dye, who worked with Yezzo and might have been able to testify regarding the memo statement. But Dye passed away in 2013 – meaning he was available to challenge Yezzo's testimony at Jim's original trial in 1993 but no longer remains available to testify in this case. Ohio Attorney General, *News and Notes* (April 24, 2013), *available at* https://www.ohioattorneygeneral.gov/Media/Newsletters/Criminal-Justice-Update/Spring-2013/Need-Some-Wheels. I decline at this time to address the admissibility of the Chilton Memo statement. Admission of the statement is not necessary for my conclusion that there is a genuine factual dispute regarding Yezzo's alleged knowing fabrication.

Issue preclusion applies under Ohio law when a fact or issue (1) was actually and directly litigated in the prior action, (2) there was a final judgment, (3) the determined issue is essential to the judgment, and (4) the parties in the prior and subsequent action are identical or, in the subsequent action, in privity with parties from the prior action. *See id.* at 491.

Plaintiff and Defendant agree that the state court's judgment on Jim's petition for post-conviction relief is a final judgment. (*See* Doc. 124, pgID 5109). They are correct. A "final appealable order" satisfies the second requirement for issue preclusion. *See Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 118 (Ohio 2006). The state court's order vacating Jim's conviction qualifies as such. *See, e.g.*, *State v. Hatton*, 205 N.E.3d 513, 523 (Ohio 2022).

Plaintiff and Defendant also agree that there is privity between the parties in this case and Jim's post-conviction proceeding. (Doc. 114, pgID 4441; Doc. 124, pgID 5109). Here, too, they are correct. Ohio favors a "broad definition" of privity. *Bus. Dev. Corp. of S.C. v. Rutter & Russin, LLC*, 37 F.4th 1123, 1136 (6th Cir. 2022) (citation omitted). *Id.* Jim and Jim's estate are in privity. Yezzo is in privity with the State. *See Moore, Successor Tr. of Clarence M. Moore & Laura P. Moore Tr. v. Hiram Twp., Ohio*, 988 F.3d 353, 360 (6th Cir. 2021) (finding township employees sued in their individual capacities in privity with the township); *see also Lenoir v. Ohio Dep't of Rehab. & Correction*, No. 1:17-CV-586, 2019 WL 3892470, at *5 (S.D. Ohio Aug. 16, 2019) (finding that the Ohio Department of Rehabilitation and Correction was in privity with its employees), *report and recommendation adopted*, No. 1:17-CV-586, 2019 WL 4168968 (S.D. Ohio Sept. 3, 2019).

Yezzo contends that the State and Jim did not, in post-conviction proceedings, actually and directly litigate the second element of a fabrication claim – whether Yezzo's allegedly fabricated opinions had a reasonable likelihood of affecting the jury. I find that they did. The

28

state court found that "Yezzo's testimony was important and significant in establishing the tool as the murder weapon and ultimately securing a conviction . . . ." (Doc. 78-1, pgID 1558). Yezzo's testimony in Jim's trial linking the Craftsman bar to the crime scene blood patterns matched the conclusions she had reached in her two pre-trial forensic reports. (Docs. 60-14; 60-15; 73-4). She does not argue otherwise. Plaintiff now alleges that Yezzo fabricated those conclusions. Accordingly, I do not find inappropriate an inference that Yezzo's allegedly fabricated forensic conclusions, the essence of her trial testimony, had a reasonable likelihood of affecting the jury. If those conclusions were "important and significant in . . . ultimately securing a conviction," their effect on a jury is evident.

I also find relevant the state court's finding that Yezzo's forensic findings were "perhaps . . . the difference-maker, that convinced law enforcement to finally charge" Jim. (Doc. 78-1, pgID 1558). In finding so, the state court was acknowledging that there was a reasonable basis to conclude, *i.e.* it was "perhaps" possible, that criminal proceedings would not have commenced at all against Jim without Yezzo's forensic conclusions. If the State might not have brought charges against Jim without Yezzo's findings, those findings would undoubtedly have a reasonable likelihood of affecting the jury. *See Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) (finding that "[a]n acquitted plaintiff may have been deprived of liberty due to fabricated evidence if there is a reasonable likelihood that without the fabricated evidence, the plaintiff would not have been criminally charged").

The significance of Yezzo's allegedly fabricated forensic analysis to the jury and the State's decision to charge Jim was also an "essential" issue for the state court's judgment. The state court vacated Jim's conviction due to the State's suppression of "impeachment evidence." (Doc. 78-1, pgID 1558). The suppression of impeachment evidence necessitated post-conviction

29

relief only because Yezzo's underlying testimony containing her forensic findings was "important and significant" to the jury's verdict and a "difference-maker" in the State's charging decision. The state court's assessment of the importance of Yezzo's findings was therefore "essential" to its grant of post-conviction relief to Jim.

Yezzo counters that issue preclusion actually works in her favor. This is so, she argues, because the state court rejected Jim's non-*Brady* grounds for post-conviction relief – specifically those regarding false testimony, junk science, shifting science, DNA evidence, and spoilation. (Doc. 124, pgID 5109-10). She argues that it is evident from the state court's dismissal of these grounds that "none of the evidence [Jim] presented at trial was fabricated." (*Id.*). I disagree.

Yezzo identifies no element from those alternate grounds for post-conviction relief that is identical to either of the two elements of Plaintiff's fabrication claim. Assuming *arguendo* that the alternate grounds do share common issues or elements with the fabrication claim, Yezzo has not identified any instance of the state court specifically entertaining and rejecting those common issues. I find no such instance in the state court's order. (Doc. 78-1). All of this is to say, Yezzo cannot show that an essential element of Plaintiff's fabrication claim was actually and directly litigated and rejected in the course of the state court's dismissal of the non-*Brady* grounds for relief. Yezzo's collateral estoppel argument therefore has no merit.

In light of these considerations, collateral estoppel entitles Plaintiff to judgment as a matter of law on the issue of whether Yezzo's allegedly fabricated opinions had a reasonable likelihood of affecting the jury. I therefore grant Plaintiff's Motion for Partial Summary Judgment on this particular element of the fabrication claim.

### ii.  Genuine Issues of Fact

Alternatively, even if I were to reject Plaintiff's collateral estoppel argument, I find that the evidence would raise a genuine issue of material fact regarding the reasonable likelihood that Yezzo's allegedly fabricated findings affected the jury.

Defendant argues that the evidence against Jim aside from Yezzo's findings was "overwhelming," such that her findings were not reasonably likely to affect the jury. (Doc. 116, pgID 4657). Plaintiff counters that there "was also considerable evidence" against Jim murdering his wife. (Doc. 121, pgID 5025). I need not weigh individually all the evidence for and against Jim's criminal liability to reach my conclusion that a genuine factual dispute would still remain regarding the significance of Yezzo's findings. Yezzo's analysis linking the Craftsman bar as the murder weapon was undoubtedly significant and reasonably likely to affect the jury. *See, e.g.*, *Gooding v. Wynder*, No. CIV.A 1:CV-07-1243, 2009 WL 4810587, at *11 (M.D. Pa. Dec. 9, 2009) (finding that "physical evidence such as a murder weapon" "strongly supported" the defendant's conviction), *aff'd*, 459 F. App'x 83 (3d Cir. 2012).

The timeline of Jim's conviction further illustrates the significance of Yezzo's findings to the murder case. Twelve years passed between Barbara's murder and the State's decision to file charges against Jim. The event that seemingly revived Barbara's cold case was Detective White's submission of the Craftsman bar to Yezzo for analysis and Yezzo's subsequent findings. A jury may reasonably infer from these facts that, but for Yezzo's findings, the State may have never charged Jim at all. *See Truman, supra*, 1 F.4th at 1236. Simply put: no testimony from Yezzo about the Craftsman bar, no prosecution, much less conviction.

### C.  Qualified Immunity

Yezzo also argues that she is entitled to qualified immunity on Plaintiff's fabrication claim.

Qualified immunity shields state officials from a § 1983 damages action, where the official's conduct "does not violate clearly established [law] which a reasonable person would have known" at the time. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The purpose of qualified immunity is to ensure that state officers are "on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Therefore, even if there is not always a case directly addressing the issues arising from a particular § 1983 claim, some rights are clearly established because they are "so obvious" from other case law. *Id.* at 741-42.

The Sixth Circuit recognizes "[i]t is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 478 (6th Cir. 2018) (quoting *Gregory, supra*, 444 F.3d at 737). This particular right was clearly established in the Sixth Circuit as of 1989, before Yezzo conducted her forensic analysis of the Craftsman bar. *See Gregory, supra*, 444 F.3d at 744 n.8 (citing *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).

I have already determined *supra* that the evidence in support of Plaintiff's fabrication claim is sufficient to overcome Defendant's Motion for Summary Judgment. In doing so, I have found that the James Report supports an inference that Yezzo knowingly fabricated her forensic findings. *See, Gregory, supra*, 444 F.3d at 744. Yezzo claims to have identified mirror images of engraved letters from the Craftsman bar deposited in blood on the bedsheet at the crime scene,

32

but the James Report supports the exact opposite conclusion, *i.e.* that letters would appear as voided areas within a bloodstain. (Doc. 118-1, pgID 4886-87). That is, the James Report is evidentiary support for the "reasonable logical inference . . . that Yezzo fabricated the 'N' and 'S' results." *Yezzo, supra*, 2022 WL 130885, at *6. She reported the existence of the "individualizing" eye mark on one side of the head of the Craftsman bar in 1993 and on the opposite side of the head during her deposition testimony. (Docs. 60-34; 116-3, pgID 4752). In addition to raising these two significant critiques, the James Report identifies several other issues with Yezzo's methodology, such as her failure to adequately document her results and verify them through peer review.

Taken together, I agree with Plaintiff that the James Report's critiques sufficiently support a finding that Yezzo's actions were well beyond acceptable forensic practice. The James Report supports an inference that her actions were beyond negligent and rose to intentional fabrication. I therefore reject qualified immunity as a basis for granting Defendant's Motion for Summary Judgment on Plaintiff's fabrication claim.

### 3.  *Brady* **Claim**

Defendant moves for full summary judgment, and Plaintiff moves for partial summary judgment on Plaintiff's *Brady* claim.

A *Brady* claim has three elements: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) it must have been suppressed, "willfully or inadvertently"; and (3) "prejudice must have ensued." *Jackson v. City of Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Forensic analysts violate their *Brady* obligation when they withhold material and exculpatory evidence from a prosecutor. *See Gregory, supra*, 444 F.3d at 744.

33

### A.  Claim Preclusion

Defendant argues that claim preclusion, *i.e. res judicata*, bars Plaintiff from raising the *Brady* claims. Specifically, because the *Brady* claim "could have been decided in the previous litigation but was not." (Doc. 124, pgID 5120).

Along with attacking the merits of Yezzo's *res judicata* argument, Plaintiff also moves to strike it as improper because Yezzo raises it for the first time in her reply brief (*id.*) in support of her Motion for Summary Judgment.[12]

### i.  Plaintiff's Motion to Strike

Raising an argument for the first time in a reply brief normally results in its waiver. *See Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 595 n.4 (6th Cir. 2008) (citing *Renkel v. United States*, 456 F.3d 640, 642 n.1 (6th Cir.2006)). But a litigant "does not err by responding in reply [to] an argument raised . . . in the response brief." *Lee v. Werner Enterprises, Inc.*, No. 3:22 CV 91, 2022 WL 16695207, at *2 (N.D. Ohio Nov. 3, 2022) (Knepp, J.) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)).

Defendant contends that Plaintiff only articulates her *Brady* claims for the first time in the opposition to her Motion for Summary Judgment; therefore, her *res judicata* argument is a permissible response. (Doc. 126, pgID 5134-35). I agree. Plaintiff, on behalf of Jim's estate, clarifies for the first time in the opposition brief her specific *Brady* claims – that Yezzo withheld

---

[12] Plaintiff also moves to strike Defendant's attack in her reply brief against Plaintiff's issue preclusion argument, which she raises in support of her own Motion for Partial Summary Judgment. (Doc. 125, pgID 5131). She characterizes Defendant's argument as an improper surreply against the Motion for Partial Summary Judgment. I deny Plaintiff's Motion to Strike on this point. Defendant is merely reiterating the argument she made in her opposition to Plaintiff's Motion for Partial Summary Judgment. (Doc. 122, pgID 5080). There is no new argument in the reply brief for me to consider, so, even if I granted the Motion to Strike on this point, my analysis regarding the Motion for Partial Summary Judgment would not change.

fabrication of her forensic reports, that her opinions were always wrong, and that she was incapable of performing her duties. (Doc. 121, pgID 5032). These *Brady* violation theories are elaborations of the allegations in Plaintiff's Complaint regarding the exculpatory nature of Yezzo's "unreliable forensic testing" and "personnel history." (Doc. 1, pgID 11, 15). But Defendant correctly notes that Plaintiff never articulated her *Brady* theories with the degree of specificity found in her opposition.

Just as Plaintiff permissibly clarifies her *Brady* arguments from the allegations of her complaint, Defendant is free to respond to them. Here, Defendant's reply was her first chance to respond to Plaintiff's specific *Brady* theories. I therefore deny Plaintiff's Motion to Strike Defendant's *res judicata* argument.

### ii. Merits of Defendant's Claim Preclusion Argument

Although I decline to strike Yezzo's *res judicata* argument, it has no merit.

As noted *supra*, I apply Ohio law when evaluating the claim-preclusive effect of an Ohio state court judgment. *See Migra, supra*, 465 U.S. at 81; *see also* 28 U.S.C. § 1738.

In Ohio, claim preclusion "prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action." *O'Nesti v. DeBartolo Realty Corp.*, 862 N.E.2d 803, 806 (Ohio 2007). It particularly bars relitigation of "the same cause of action." *Lemons v. State*, 164 N.E.3d 538, 547 (8th Dist. 2020). Alternatively, "[w]here a claim could have been litigated in the previous suit, claim preclusion also bars subsequent actions on that matter." *O'Nesti, supra*, 862 N.E.2d at 806. This alternate version of claim preclusion is the argument Yezzo makes.

Yezzo's *res judicata* argument fails due to the simple fact that Jim could not have litigated in his post-conviction proceeding the § 1983 claim his daughter now brings on behalf of

his estate. The remedies sought in each are entirely distinct. Jim's post-conviction proceeding sought exoneration or invalidation of his conviction. Plaintiff's § 1983 claim seeks money damages against a particular state official, Yezzo, who was involved with the prosecution. These are not "the same cause of action." *Lemons, supra*, 164 N.E.3d at 547; *see also Rhodes v. Hannigan*, 12 F.3d 989, 991 (10th Cir. 1993) (holding that a judgment on a habeas petition for injunctive relief has no *res judicata* effect on a § 1983 action for compensatory damages because it is a "different cause of action"); *Teague v. Cox*, No. 1:06-CV-91, 2008 WL 2518699, at *5 (E.D. Tenn. June 19, 2008) (characterizing a habeas corpus and § 1983 claims as "different causes of action").[13]

   None of the cases Yezzo cites hold otherwise. In *State ex rel. Jefferson v. Wilkerson*, No. 05AP-520, 2006 WL 3240502 at *1-3 (10th Dist. 2006), an incarcerated defendant sought release from prison through a habeas petition arguing, in part, that "he was not properly credited with time served" on a separate sentence. The state court denied his petition. *Id.* The defendant, again seeking release, then submitted a petition for writ of mandamus under the alternate theory that his two sentences ran concurrently. *Id.* Under these circumstances, where the defendant sought the same injunctive post-conviction relief under "alternative legal theories," *res judicata* barred his petition for writ of mandamus. *Id.*

   In *Hicks v. State Farm Mut. Auto. Ins. Co.*, No. 2016CV00462, 2016 WL 9735152, at *1 (Ohio Com.Pl. Apr. 11, 2016), the plaintiff, a car crash victim, brought an action against an insurer to enforce a judgment for damages he had won in an earlier tort action against the driver of the vehicle. The state court in the earlier action had found that the insurance policyholder, a

---

[13] In fact, as discussed *supra*, *Heck* prohibits collateral attacks on an outstanding conviction through a § 1983 action. Jim's post-conviction petition was the proper method of challenging the conviction. This highlights the difference between the two causes of action.

different person from the driver, had not entrusted his vehicle to the driver. *Id.* at \*2. The *Hicks* court determined that the disposition of this earlier action barred the plaintiff's subsequent one to enforce a judgment against the insurer under a different theory of entrustment by the policyholder. *Id.* at \*3. Here, as in *State ex rel. Jefferson*, the plaintiff sought the same remedy in both actions, this time for compensatory relief.[14]

Neither case supports Yezzo's *res judicata* argument. Unlike in *State ex rel. Jefferson* and *Hicks*, Plaintiff seeks a vastly different remedy, money damages against a specific state official, than the injunctive relief Jim sought in his post-conviction petition. They are simply different causes of action. Yezzo's *res judicata* argument therefore does not entitle her to judgment as a matter of law on Plaintiff's *Brady* claim.

### B.  Issue Preclusion

Plaintiff argues in the Motion for Partial Summary Judgment that the state court's order vacating Jim's sentence precludes Defendant from relitigating the *Brady* elements regarding whether the evidence at issue was favorable to the accused and whether prejudice ensued as a result of suppression. I disagree.

In the state court post-conviction proceeding, Jim and the State never directly litigated Plaintiff's *Brady* violation theories. This forecloses my application of collateral estoppel in favor of the Plaintiff.

---

[14] Yezzo fails to mention an important coda to the trial court's holding in *Hicks*. On appeal, the state appellate court, while affirming the holding of the trial court, expressly rejected the *res judicata* theory that Yezzo now argues in favor of. *See Hicks v. State Farm Mut. Auto. Ins. Co.*, 95 N.E.3d 852, 861 (2nd Dist. 2017) ("We do agree with the general proposition that collateral estoppel applies to points that were decided *rather than those that could have been decided*") (emphasis added).

Plaintiff concedes in her Motion for Partial Summary Judgement that the suppressed evidence the state court considered "favorable" to Jim was Yezzo's "troubled behavior in the workplace" and the comment from the Chilton Memo that she "will stretch the truth to satisfy a department." (Doc. 114, pgID 4435). When referencing Yezzo's troubled workplace behavior, the state court specifically identified her physical threats of violence against her coworkers, her "contemptuous behavior toward her superiors," and her placement on administrative leave shortly before testifying in Jim's trial. (Doc. 78-1, pgID 1557).

The state court never considered Yezzo's alleged statements of self-doubt to Daniel Cappy that her opinions were "always wrong." It also never considered the possibility that Yezzo potentially withheld from the prosecutor that she had fabricated her findings. The state court did not opine on either the favorability or materiality of such evidence. The parties never actually and directly litigated those particular issues.

I therefore deny Plaintiff's Motion for Partial Judgment as it relates to the favorability and materiality elements of Plaintiff's *Brady* claim.

### C.  Favorability

While I decline to apply issue preclusion in Plaintiff's favor on the *Brady* claim, I do find that Plaintiff has shown a genuine issue of material fact regarding the favorability of the evidence she now identifies.

First, it is readily apparent that it would be exculpatory evidence for Jim if he could have established in trial that Yezzo had fabricated her forensic findings. *See Gregory, supra*, 444 F.3d at 744 (holding that a *Brady* claim exists when a forensic analyst withholds her fabrication of findings against the accused); *see also Atkins v. County of Riverside*, 151 Fed. App'x 501, 505-06 (9th Cir. 2005) (explaining that withholding the fact of fabrication would "instantly upset the

credibility of the rest of the police investigation" and is a "sufficient basis for a *Brady* claim"); *Manning v. Miller*, 355 F.3d 1028, 1032-23 (7th Cir. 2004) (holding that FBI investigators' submission of "false written reports" and concealment of such falsification to the prosecutor constitutes a *Brady* claim). I have already held *supra* that Plaintiff's fabrication claim survives summary judgment. While Plaintiff's *Brady* claim regarding the withholding of fabricated evidence is undoubtedly redundant with the fabrication claim itself, the former is still a distinct cause of action. Two tracks to the same end station.

Second, Yezzo's alleged expressions of self-doubt to Cappy that her conclusions were "always wrong" and that she was incapable of performing her duties was undoubtedly favorable to Jim as impeachment evidence against Yezzo's testimony. It is evidence that Jim could have used to directly call into question Yezzo's findings in Jim's case.

### D.  Suppression

I also find that Plaintiff can establish a genuine dispute of material fact regarding Defendant's suppression of the evidence favorable to Jim. It is clear from the record that Yezzo did not disclose her alleged fabrication of evidence to the prosecutor, nor the particular statements she allegedly made to Cappy regarding her work performance self-doubts. The prosecutor only knew that Yezzo had been placed on administrative leave for her threats of physical violence against her coworkers. (*See* Doc. 60-3, pgID 497-98). A genuine dispute of fact therefore remains for the jury regarding whether Yezzo suppressed the specific favorable evidence that Plaintiff now identifies.

### E.  Materiality

Favorable evidence is material if "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Jackson, supra*, 925 F.3d at 815.

For the same reason I would find a genuine dispute of material fact[15] regarding the reasonable likelihood that Yezzo's allegedly fabricated findings would affect the jury, I also find that Yezzo's suppression of her alleged fabrication would be material. *See Gregory, supra*, 444 F.3d at 737; *see also Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 573 (9th Cir. 2022) (observing that "most other federal circuits have applied variations of the Brady materiality causation standard to § 1983 claims for deliberate fabrication of evidence).

I also find that Yezzo's statements of self-doubt would be material. I do not give the state court's order any preclusive effect regarding the materiality element. But I echo the state court's reasoning that the specific impeachment evidence at issue there – that Yezzo "will stretch the truth to satisfy a department" – sufficed for vacating Jim's conviction under *Brady*. Similarly, Jim might have used Yezzo's statements that her opinions were "always wrong" and that she was incapable of performing her duties to undermine the entirety of her findings, which the state court characterized as a "difference-maker." (Doc. 78-1, pgID 1558).

## F. Qualified Immunity

While she invokes the defense of qualified immunity in her Motion for Summary Judgment, Yezzo never explains its application to Plaintiff's *Brady* theories. (*See* Doc. 124).

I find that qualified immunity applies to Yezzo's alleged suppression of her statements of self-doubt regarding work performance. Plaintiff identifies no case law indicating that a forensic analyst's suppression of self-doubt regarding her job performance was a *Brady* violation under clearly established law in 1993. Yezzo contends that, even after her alleged statements of self-doubt to Cappy, he maintained his confidence in her work performance (Doc. 88-25, pgID 4275-

---

[15] Again, as an alternative to my grant of Plaintiff's Motion for Partial Summary Judgement on the element in question: the reasonable likelihood of the fabricated evidence affecting the jury.

77) and continued to assign her difficult cases (Doc. 116-3, pgID 4752). Because Yezzo's self-deprecating comments apparently had no bearing on how her supervisors evaluated her and assigned her cases, I find that a reasonable person in Yezzo's position would not have known that failure to disclose her self-deprecating comments would be material.

On the other hand, Yezzo is not entitled to qualified immunity on Plaintiff's *Brady* theory that she suppressed her alleged fabrication of evidence. Although Plaintiff cites to no case law prior to 1993 indicating that a forensic analyst violates *Brady* by failing to disclose her fabrication of evidence, I find that such a violation is "so obvious" and patent, *see Hope, supra*, 536 U.S. at 741-42, as to be clearly established at the time. *See Gregory, supra*, 444 F.3d at 744 (holding that a forensic analyst "cannot seriously contend that a reasonable [investigator] would not know that" suppression of her fabrication would be "inappropriate and . . . in violation of an individual's constitutional … rights") (quoting *Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999).

## Conclusion

Plaintiff's proffered expert reports are admissible. Under the Ohio doctrine of issue preclusion, she is entitled to judgment as a matter of law regarding the second element of her fabrication claim. Plaintiff's Motion to Strike Defendant's argument on reply is without merit, but she has nevertheless successfully established genuine issues of material fact regarding the first element of her fabrication claim and the three elements of her *Brady* claim, specifically as it relates to her theory that Defendant suppressed allegedly fabricated evidence.

It is, therefore, ORDERED that

1. Defendant's Motion to Exclude Plaintiff's expert reports (Doc. 115) be, and the same hereby is, denied;

41

2. Defendant's Motion for Summary Judgment (Doc. 116) be, and the same hereby is, denied;

3. Plaintiff's Motion for Partial Summary Judgment (Doc. 114) be, and the same hereby is, granted in part and denied in part, consistent with this opinion; and

4. Plaintiff's Motion to Strike Defendant's arguments (Doc. 125) be, and the same hereby is, denied.

The Clerk shall forthwith schedule a status conference.

So ordered.

<u>/s/ James G. Carr</u>
Sr. U.S. District Judge