UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DEBRA O'DONNELL, *et al.*, | : | |
| | : | Case No. 3:17-cv-2657 |
| Plaintiffs, | : | |
| | : | Judge James G. Carr |
| v. | : | |
| | : | **DEFENDANT MICHELE YEZZO'S** |
| G. MICHELE YEZZO, *et al.*, | : | **STATUS REPORT AND REQUEST FOR** |
| | : | **LEAVE TO FILE A SECOND MOTION** |
| Defendants. | : | **FOR SUMMARY JUDGMENT** |

Pursuant to the Court's July 5, 2023 Minute Order, Defendant Michele Yezzo ("Defendant") submits the following Status Report and Request for Leave to File a Second Motion for Summary Judgment:

1. On July 6, 2023, Defendant produced the newly discovered 1993 BCI Handbook ("Manual") to Plaintiff's Counsel;

2. On August 11, 2023, Plaintiff deposed Ted Manasian, the person from whom the Manual was procured and upon which he was trained on the standard of professional care by three BCI forensic scientists over a seven-month period between February and August, 1993.

3. The practice standards set forth in the Manual are critical. Not only does the Manual specifically instruct that blood stain patterns be documented using notes and drawings, nowhere does the Manual even suggest, much less recommend, the use of photography in doing so.

4. Likewise, nowhere does the Manual suggest, much less require, that forensic analysts' findings be peer reviewed.

5. Furthermore, the Manual teaches that the actual tool in question should be used when a forensic scientist is testing for blood stain comparisons.

6. In addition, the Manual instructs forensic scientists on the use of O-Tolidine, including that a sample should not be allowed to stand for more than 60 seconds before being observed since it will change color from oxidation in air overtime.

7. Equally important, the Manual advises forensic scientists that depending on the nature of the blood stain patterns and the experience of the examiner it is often possible to determine the locations and orientation of persons and/or objects at the time the blood was shed, the movement of persons and/or objects during or after bloodshed, the points of origin of the bloodshed, and the possible type of weapon(s) that were used.

8. In so doing, the Manual specifically teaches that contact impressions made by bloody objects touching non-bloody surfaces may leave characteristic impressions for comparison and that actual blood should be used for testing purposes.

By contrast with the standard of care for forensic analysts set forth in the Manual, Plaintiff's expert, Stuart H. James ("James") reported that Defendant's forensic analysis and related testimony regarding the murder victim's bloody sheet "was well beyond what a reasonable forensic examiner would opine based on the evidence." ECF No. 118-1, PageID 4885-86. According to James, Defendant's failure to photograph the sheet in question during or immediately after chemical enhancement[1] was "unacceptable forensic practice" since at the time of Defendant's examination, "a reasonable forensic scientist analyzing bloodstains would not render [an opinion] that was not supported by lab notes and or photography or witnessed by a colleague." ECF No. 118-1, PageID 4885-86. However, while James may claim that he is familiar with the standard of practice for forensic scientists engaged in blood stain pattern analysis in 1993, nowhere in his 22-page Case Report does he cite to *any* source which references the professional standards applicable to forensic scientists in 1993.

It is therefore significant that the Manual, the only source that references the professional standards which forensic analysts, at least those at BCI, were to follow in 1993, requires neither photography of blood stains nor a second opinion. Moreover, not only did Defendant go above and beyond what the Manual required by attempting to photograph her findings regarding the enhanced "N" and "S" before they dissipated, she most certainly supported her findings with her notes and drawings as the Manual instructed. *See* Lab Notes, ECF No. 116-4.

---

[1] Although Defendant succeeded in photographing the "N" pre-enhancement *See* Parsons Trial Transcript, Plaintiff's Supp. Statement and Transcripts, she was unable to photograph the "N" or the "S" post-enhancement because by the time she measured and documented them in her notes and drawings as the Manual instructed the image had dissipated from oxidation in the air. ECF No. 73-4, PageID 1066-68, 1115-16, 1070-71, 1115-16.

Likewise, James reported that since Defendant failed to document her findings or receive a second opinion, Defendant's opinion that the bloodstains on the murder victim's nightgown presented an "eye shape," "individualizing mark" matching the head of the Craftsman bar was "well beyond any opinion that a reasonable forensic examiner would find based on the evidence." *Id.*, PageID 4888. However, not only did James do no testing with blood using the actual tool, *Id.*, but also Defendant photographed and prepared overlays of both the nightgown and the tool in question, *Id.*, PageID 4871-4872, thereby going above and beyond the standard of professional care the Manual required regarding documentation. Moreover, James' own testing revealed a bird's eye shaped blood stain directly below the head of the breaker bar which is consistent with Defendant's findings. *See Id.,* PageID 4884, Figure 19. 4576, Figure 19.

Furthermore, although James reported that Defendant's trial testimony regarding cast-off blood stains on the wall of the crime scene was "well beyond [what] a reasonable forensic examiner would find based on the evidence" and that the use of the tool in question to perform her experiment "has always been considered unacceptable forensic practice before 1993," ECF No. 118-1, PageID 4888-89, not only does the Manual specifically instruct otherwise, but also the Court expressly found that Defendant was absolutely immune for her testimonial acts on this issue. ECF No. 128, PageID 5208.

In sum, not only is the Manual the *only* document that sets forth the professional standard of care applicable to forensic scientists in 1993, it directly refutes the standard of care James claims was in effect during the relevant time period. Since the Manual calls into question James' opinion that Defendant's actions were well beyond acceptable forensic practice, and the Court relied heavily on the James Case Report in issuing its summary judgment decision, ECF No. 128, PageID

3

5215, Defendant seeks leave of Court to file a second motion for summary judgment on the issue of evidence fabrication.

        Respectfully Submitted

        DAVE YOST
        Ohio Attorney General

        /s/ Mindy Worly
        MINDY WORLY (0037395)
        Principal Assistant Attorney General
        Criminal Justice Section
        Corrections Litigation Unit
        30 East Broad Street, 23rd Floor
        Tel (614) 728-0161
        Fax (866) 474-4985
        Mindy.Worly@OhioAGO.gov

        *Counsel for Defendant Yezzo*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2023, a copy of *Defendant Michelle Yezzo's Status Report and Request for Leave to File a Second Motion for Summary Judgment* was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

        /s/ Mindy Worly
        MINDY WORLY (0037395)
        Principal Assistant Attorney General